Filed 5/25/18

**CERTIFIED FOR PARTIAL PUBLICATION**[*]

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| THE PEOPLE,<br><br>        Plaintiff and Respondent,<br><br>v.<br><br>JUSTIN BROOKS,<br><br>        Defendant and Appellant. | A147410<br><br>(Contra Costa County<br>Super. Ct. No. 51513811) |

Defendant Justin Brooks appeals from his conviction for first degree burglary.  He contends that the trial court erred in admitting evidence of uncharged prior burglaries to establish intent, common plan and identity; that the prosecutor engaged in prejudicial misconduct in closing argument; and that the cumulative prejudice of these errors warrants reversal.  Brooks also challenges the trial court's order of restitution, to the extent it included the costs of certain home security improvements made by the victim, pursuant to Penal Code section 1202.4.[1]  Specifically, he contends that the statute does not permit restitution for security improvements against a defendant not convicted of a "violent felony," as defined in section 667.5, subdivision (c).

We hold that the trial court's erroneous admission of Brooks's uncharged prior acts and the prosecutor's misconduct caused Brooks to suffer little, if any, prejudice because other evidence independently and definitively linked him to the crime.  As to the restitution issue, we reject Brooks's unduly narrow reading of the restitution statute and

---

[*] Pursuant to California Rules of Court, rules 8.1105(b) and 8.1110, this opinion is certified for publication with the exception of part I.

[1] Unless otherwise specified, future statutory references are to the Penal Code.

1

hold that the award of restitution was not precluded as a matter of law.  Accordingly, we affirm.

## STATEMENT OF THE CASE

On August 21, 2015, the Contra Costa County District Attorney filed an information charging Brooks with first degree residential burglary in violation of sections 459 and 460.

Jury trial commenced on December 10, 2015.  On December 11, the prosecution filed a motion in limine to admit evidence of Brooks's numerous prior uncharged burglaries.  (Evid. Code, § 1101, subd. (b).)  After a hearing and over defendant's objections, the trial court admitted evidence of two prior acts from April 2 and April 6, 2012.  On December 16, 2015, the jury found Brooks guilty of first degree residential burglary.

Following the sentencing hearing on January 15, 2016, the trial court sentenced Brooks to prison for the two-year low term, imposed mandatory fines and fees, and ordered him to pay $2,351.34 in direct victim restitution that included reimbursement for a burglar alarm and new door locks.

Brooks timely appealed.

## STATEMENT OF FACTS

In May 2015, Mona Greathouse lived in a one-story, two bedroom bungalow on Maple Avenue in Concord.  Upon returning home from work the evening of May 25, she noticed that the dead bolt on the front door was unlocked (though she had locked it when she departed that morning).  Upon entering the home, she discovered that her home had been ransacked:  cabinets and drawers throughout the home were open and items had been rifled through and strewn about.  A window in the smaller of the two bedrooms (which she used as a home office) had been broken, and there was glass on the ground both outside and inside the window.  (This window had been damaged about three months prior, and Greathouse had placed duct tape over a nine-inch crack prior to the break-in.)

2

At Greathouse's request, a neighbor called the police. When Concord Police Officer Danielle Cruz arrived, they walked together through the home and into the backyard. Greathouse discovered that her iPad had been taken from the living room and some checks may have been removed from her checkbook in her office.

In the backyard, the screen door latch had been "broken off completely," and several window screens were removed or damaged. The glass (which was cracked prior to the burglary) had been removed from a window in the office, and there was glass on the ground. With the glass removed, the interior window lock was accessible; the lock was open and the lower sash, pushed up. From this, Officer Cruz surmised that the perpetrator(s) had entered Greathouse's residence through the damaged rear office window and exited through the front door.

Forensic Specialist Angela Anzelone collected glass fragments from the ground under the broken office window, from which she was able to lift two fingerprints of good quality and detail.[2] These two prints were placed on separate cards and run through a program called the Cogent Automated Fingerprint Identification System (CFIS) used to search the Automated Fingerprint Identification System (AFIS). CFIS returned a list of 30 potential candidates, with Brooks listed as number one (the presumed closest match).

Forensic Specialist Nicole Mendenhall, who testified in the area of fingerprint examination and comparison, compared one of the fingerprints Anzelone had collected (the latent print) with the number 9 finger on a set of appellant's fingerprints that had been taken on or about April 19, 2012, which were contained in AFIS.[3] She utilized the ACE-V method—which stands for Analyze, Compare, Evaluate and Verify—a procedure

---

[2] She was unable to find any other fingerprints in other areas of the house.

[3] The exemplar prints Mendenhall compared to the latent print from the crime scene were not the same prints initially identified by CFIS as a potential match. After reviewing the exemplar selected by CFIS, Mendenhall pulled another of Brooks's exemplar prints from AFIS, which she felt were clearer, and utilized that exemplar in determining that the latent print was left by Brooks. At trial, expert Blickendorfer, a fingerprint technician who rolled Brooks's prints at a preliminary examination in this case and compared the rolled prints to the two exemplars considered by Mendenall, testified that the rolled set and the two exemplars all belong to Brooks.

for comparing a known print to a latent print, which she described in some detail. She found 17 points of comparison, nine more than necessary for a match, and thus concluded that the latent print matched Brooks's known exemplar.

Based upon Mendenhall's identification, Detective Erika Reed, a Concord police officer, obtained and dialed a telephone number for Brooks. A male answered the phone, said he was not Brooks, and offered to find him. Then a different male came to the phone and identified himself as Brooks. Detective Reed (who had apparently never spoken with Brooks before) did not recognize his voice. However, the speaker provided Brooks's date of birth (which Reed confirmed) and stated that his "stepdad" had informed him that the detective wished to speak with him.

Reed testified that she told Brooks about the burglary and the fact that Brooks's print had been found on the broken window, and asked if Brooks could tell him where Greathouse's iPad was. Brooks initially claimed ignorance, then said he was uncomfortable talking about the iPad, and then admitted that he had the iPad earlier but had left it (in a backpack) with an unidentified male in San Francisco. He also admitted to entering Greathouse's home, because he "was lost and didn't know what to do." He said he recalled pulling glass from a window and possibly crawling through the window. He claimed he was "high on meth" when he "did it" and could not recall whether or not he used the iPad because his memory was "a blur." Brooks initially said he could not recall taking anything in addition to the iPad, but then acknowledged that he "might have" taken Greathouse's personal checks and "might have thrown them away."

At trial, the court admitted evidence that Brooks had previously committed two uncharged crimes, specifically, burglary. First, on April 2, 2012, Brooks broke into an in-law bungalow inhabited by other members of his family, on the same property where Brooks lived.[4] The bungalow was locked and Brooks did not have permission to enter. Several windows at the back of the unit had been broken. Brooks took a portable gaming

---

[4] At the time, Brooks's stepfather and mother were living in the in-law unit and their two daughters and Brooks were living in the main house.

system and used a computer. Brooks's stepfather found the gaming system in Brooks's room and called the police. The officer dispatched to the scene spoke to Brooks. Brooks, while holding the portable gaming system, admitted that he had taken it but said he was planning to return it.

Second, on April 6, 2012, there was a residential burglary at a home on Euclid Avenue in Concord. One of the home's inhabitants testified that when he returned home from work, he found the rear doors of the home had been "kicked in or pulled" open. The bedsheets had been moved and the victim's laptop taken from the bed, where he had left it; the dresser drawers were open and looked as if someone had rifled through them; and the closet door was open. In addition to the laptop computer, an iPad and video games were missing. His roommate also found his laptop to be missing.

One of the victims suggested their former roommate, who had recently moved out and with whom they had a dispute, as a potential suspect; this led the investigating officer to suspect Brooks, who had previously visited the roommate at the residence. The officer contacted Brooks's stepfather and then spoke with Brooks in the presence of his mother and stepfather. Brooks admitted to having met up with another male, who claimed to have a dispute with one of the residents at the Euclid Avenue residence and suggested they should "break into the house and steal stuff to get even." Brooks admitted that his companion pried open the back doors and took a laptop from one of the bedrooms and that Brooks had taken a laptop, an iPad, and several video games from another bedroom.

In closing argument, the prosecutor argued that Brooks's prior offenses were relevant to show intent, common plan, and identity. Focusing on identity, defense counsel challenged the reliability of both Brooks's confession and the qualifications and methodology of expert Mendenhall. On rebuttal, the prosecutor repeatedly suggested, over defense counsel's objection, that more than one fingerprint expert had verified that the latent print belonged to Brooks. Defense counsel's objections were overruled.

The jury found Brooks guilty of first degree burglary. Defendant's sentencing statement sought probation. The prosecution's memorandum opposed probation in favor of incarceration. The probation officer's report recommended $973.14 in restitution,

based upon the victim's impact statement requesting reimbursement for her lost iPad, for glass repair, eight hours of lost wages, and the City of Concord's permit fee for residential security alarms. It did not include the amounts disputed here, for a security system, doorknobs, and deadbolts.

At the hearing, the prosecutor described Greathouse's victim impact statement, including that Greathouse had been "more scared" since the burglary and "had to put in a burglar alarm." The court ordered victim restitution in the amount of $2,351.34, or $1,378.20 higher than the amount in the probation report.[5]

## DISCUSSION

### I. Guilt Phase – Impact of Trial Court Error and Prosecutorial Misconduct

#### A. Admission of Uncharged Prior Offenses

Brooks challenges the admission of prior uncharged acts of residential burglary pursuant to Evidence Code section 1101, subdivision (b). The prosecution sought to admit 11 incidents, including four residential burglaries. After conducting part of the hearing in chambers, the trial court announced it had tentatively "narrow[ed] down" the incidents to the two most relevant.

Defense counsel argued that these acts should not be admitted, particularly for purpose of proving intent, as that issue would not be contested: "I don't believe I can realistically argue that there was a lack of intent by the perpetrator who went into . . . Greathouse's home. . . ." He also stressed that "[t]he issue for the defense in this case is *identity*. . . ." (Italics added.)

---

[5] Brooks's application to settle record on appeal, which was granted by the trial court, explains that at the sentencing hearing the prosecution submitted additional expenses incurred by the victim which were not included in the record. The application attached the excluded exhibits documenting the victim's additional expenses—including for the installation of a home security alarm, installation of a security chain, and replacement and/or adjustment of two deadbolts and lockset—which account for the $1,378.20 discrepancy. However, there was no discussion of these amounts, or the basis for the restitution award, in the parties' written submissions or at the hearing.

The prosecutor then clarified that she sought admission not only for purposes of identity and intent (to which the court had tentatively agreed), but also "to prove a plan, to prove lack of mistake." The prosecutor argued that the similarities between the uncharged priors and the Greathouse burglary were numerous and distinctive enough to warrant admission for all three purposes.

The trial court granted the motion, admitting the two April 2012 offenses to prove the identity of the perpetrator, to establish the perpetrator's intent to commit a theft, and to show that the burglary was part of a common plan or scheme and instructed the jury accordingly. In closing argument, the prosecutor urged the jury to consider this evidence for all three purposes.

We doubt that the evidence of Brooks's prior burglaries was properly admitted. (Evid. Code, § 1101, subd. (b); *People v. Cole* (2004) 33 Cal.4th 1158, 1194 ["such evidence is admissible 'when relevant to prove some fact (such as motive, opportunity, intent, preparation, plan, knowledge"]; *People v. Ewoldt* (1994) 7 Cal.4th 380, 404 (*Ewoldt*) [discussing criteria for admission].) The three crimes were more different than similar: one was instigated by a friend, the others carried out independently; Brooks had prior personal connections with the victims of the two prior burglaries, but none with Greathouse; in two of the incidents, access was obtained through broken windows, while in a third, French doors were pried open; in only one was the victim's home "ransacked"; and, in each, different types of items were taken (not just personal electronics, but also video games and personal checks). (*Ewoldt,* at pp. 402–403 [requiring some degree of similarity to establish relevance for each purpose].) In any event, two of the bases for admission—"common plan" and "intent"—were never put in issue by the defense, as there was ample other evidence establishing these elements. (*Id.* at p. 406.)[6]

---

[6] The "common plan" argument is particularly baffling, as the prosecutor never argued that the Greathouse burglary and prior acts (which occurred years earlier) were part of any overarching plan (*Ewoldt, supra*, 7 Cal.4th at p. 403) and no evidence suggested anything other than a series of spontaneous, unrelated acts (*People v. Alcala* (1984) 36 Cal.3d 604, 634, superseded by statute on other grounds as stated in *People v. Falsetta* (1999) 21 Cal.4th 903, 911).

7

As defense counsel predicted at the in limine hearing, the trial focused on identity.[7]  As we have noted, however, the differences among the three crimes were substantial, and the similarities are unremarkable.  (*Ewoldt*, *supra*, 7 Cal.4th at p. 403; *People v. Felix* (1993) 14 Cal.App.4th 997, 1005.)[8]

That said, we cannot find any reasonable probability that, absent the error, the jury would have reached a more favorable verdict.  (*People v. Alcala, supra*, 36 Cal.3d 604, 636, citing *People v. Watson* (1956) 46 Cal.2d 818, 836-837 (*Watson*).)  Here, there was independent, compelling evidence of conduct constituting a crime, the intent to steal, and the identity of the perpetrator.  As to the last point, Brooks's fingerprint was lifted from the suspected point of entry and Brooks *admitted* to the investigating detective that he broke into Greathouse's home and took her belongings.  And defense counsel's challenges to the fingerprint evidence and Brooks's admissions were not compelling.[9]

---

[7] We reject the suggestion that defense counsel may have forfeited this issue below.  The Attorney General apparently agrees.  Thus, we need not determine defendant's ineffective assistance of counsel argument.

[8] See also *People v. Nottingham* (1985) 172 Cal.App.3d 484, 500 (there were material differences among prior and charged offenses and similarities were common in sex assault cases, not distinctive); *People v. Rivera* (1985) 41 Cal.3d 388, 391 (*Rivera*), disapproved on other grounds in *People v. Lessie* (2010) 47 Cal.4th 1152, 1168 (when charged and prior crimes involved multiple perpetrators, use of a weapon and a getaway vehicle, and occurred at a convenience store, similarities were not distinctive); *People v. Bigelow* (1984) 37 Cal.3d 731, 749 (use of weapon and ordering victims to lie down not sufficiently distinctive to infer that defendant was the triggerman and murderer as charged); *People v. Haston* (1968) 69 Cal.2d 233, 247–248 (robbery of closed businesses when employees were present by two armed, middle height Caucasian men who wore handkerchiefs over their faces, who entered and exited via employees' entrance/exit, who forced employees to lie face down on the floor but never injured them, and who split duties of managing employees and robbing safe, not sufficiently distinctive to constitute a "signature" until the presence of a particular individual (other than defendant) at each of the crimes was added).

[9] Defense counsel challenged Mendenhall's testimony by arguing that Mendenhall lacked certain certifications, her methodology was untrustworthy, and her results should have been verified by an independent expert.

As to the confession, defense counsel argued, inter alia, that the detective could not have known, for certain, that it was Brooks on the telephone and emphasized

8

Under these circumstances, there was no reasonable probability that, absent the introduction of the prior uncharged offenses, the result would have been more favorable to Brooks. (See, e.g., *People v. Felix, supra*, 14 Cal.App.4th at p. 1008 [where there were three independent courtroom identifications of defendant Felix and two from photographic lineups, introduction of prior conviction was nonprejudicial and unlikely to affect the verdict; by contrast, as to defendant Pedrico, where the other evidence of identity was "significantly weaker," the use of the prior conviction was "correspondingly more important" and the jury was reasonably likely to have doubts about that identification, and the conviction was reversed as to Pedrico]; *People v. Gordon* (1990) 50 Cal.3d 1223, 1235–1237, declined to follow on other grounds *People v. Edwards* (1991) 54 Cal.3d 787 [where main defense was mistaken identity, admission of similar priors was not *Watson* error where there ample other evidence incriminating defendant]; *People v. Foster* (2010) 50 Cal.4th 1301, 1333 [erroneous admission of evidence of prior similar offenses did not constitute *Watson* error, in part because there was "overwhelming evidence establishing that defendant was, in fact, the perpetrator of the charged crimes"].)

Brooks's authorities are unpersuasive. In *People v. Nottingham, supra*, 172 Cal.App.3d 484, the erroneous admission of prior crimes was compounded by instructional error resulting in significant prejudice, as well as the erroneous admission of other, unrelated testimony, which was inflammatory and prejudicial to defendant. (*Id*. at pp. 498, 501.) His other cases involved evidence against the defendant which was either weak or equivocal, such that evidence of prior acts was more likely to sway the jury. (*People v. Lopez* (2011) 198 Cal.App.4th 698, 716; *People v. Bruce* (1989) 208

---

defendant's claim, during the interview, that at the time of the break-in he was high on drugs and his memory was "a blur." These arguments are undermined by other evidence from which the jury reasonably could have found the confession was in fact provided by Brooks, including that at the start of the interview, the speaker provided Brooks's correct birthdate and said that his stepfather had warned him to expect the call. Regarding Brooks's self-serving claim that his memory of the incident was poor, Brooks admitted he recalled pulling glass from Greathouse's window and crawling through it.

Cal.App.3d 1099, 1103–1106; *Rivera, supra,* 41 Cal.3d at pp. 392–393; *Alcala, supra*, 36 Cal.3d at pp. 635–636.)

Thus, the admission of two uncharged priors, alone, does not warrant reversal.

### B. Prosecutorial Misconduct

Brooks also contends that the prosecutor committed misconduct during closing argument by mischaracterizing the nature of the fingerprint evidence and overstating its strength. On rebuttal, the prosecutor stated that after expert Mendenhall matched the latent fingerprint to Brooks's exemplar, "somebody else independently came in and verified that that print, the latent, matched the known print for Justin Brooks." Although there was no evidence in the record[10] to support this argument, the court overruled defense counsel's objection. Shortly thereafter, the prosecutor stated that the jury "heard from *several* experts who verified the latent matched the exemplars." (Italics added.) Again, defense counsel's objection was overruled. Then the prosecutor re-stated her position: "You heard from multiple experts. *Some* said the latent matched the exemplar. The other ones told you the exemplars matched other known exemplars." (Italics added.) Because "some" experts did not verify that the latent matched the exemplar, the prosecutor's comments were not a fair inference from the facts; they mischaracterized the facts. (*People v. Dennis* (1998) 17 Cal.4th 468, 522; *People v. Jasso* (2012) 211 Cal.App.4th 1354, 1372.)[11]

Whether this misconduct warrants reversal is another question.

Brooks first argues that the prosecutor's statements rendered the entire trial fundamentally unfair and the conviction must be reversed absent a showing that the misconduct was harmless beyond a reasonable doubt. While we do not condone the conduct of the prosecutor in this case, we cannot find an error of federal constitutional

---

[10] As disclosed by our summary of the evidence, although multiple experts testified as to various aspects of the fingerprint evidence, only *one* expert (Mendenhall) testified that she verified that the latent fingerprint lifted at the scene belonged to Brooks.

[11] We also agree with Brooks that counsel's objections preserved this issue for appeal. (*People v. Bordelon* (2008) 162 Cal.App.4th 1311, 1323 (*Bordelon*).)

10

dimensions. Unlike the prosecutor in *People v. Johnson* (1981) 121 Cal.App.3d 94, cited by appellant, here the prosecutor did not inject new material into the case, transforming herself into witness who could not be cross-examined and undermining defendant's right to confront witnesses. (*Id*. at pp. 102–105.) As Brooks acknowledges, the prosecutor "exaggerate[ed] the weight" of evidence already in the record. *Davis v. Zant* (11th Cir. 1994) 36 F.3d 1538, also cited by Brooks, is likewise unavailing. In that case, the misconduct was "extensive" rather than isolated (misrepresentations throughout the guilt phase of the trial) and far more egregious (in addition to false statements, disparaging defense counsel and their management of the defense). (*Id.* at pp. 1546–1551.)

The improper exposure of jury to certain factual matters is usually tested under the *Watson* standard. (*Bordelon, supra,* 162 Cal.App.4th at pp. 1323–1324.) The testimony of the experts involved in lifting, scanning, and comparing the various fingerprints in evidence was not unduly complex or highly technical; thus, it seems unlikely "that the jury construed or applied the complained-of remarks in an objectionable fashion." (*People v. Jasso, supra*, 211 Cal.App.4th at p. 1362.) More importantly, the prosecutor's attempt to "bolster" the fingerprint evidence was immaterial in light of Brooks's admissions to Detective Reed, which positively established that Brooks was at Greathouse's residence. Thus, we find the prosecutor's statements likely did not have "any material impact on the jury's view of the case." (*Bordelon,* at p. 1324.)

### C. Cumulative Prejudice

Brooks contends that the combined effect of the foregoing errors deprived him of a fair trial, under both federal and state standards. The argument is premised on his view—which we do not share—that the admission of prior offenses was "highly prejudicial," such that even minimal prejudice caused by the prosecutor's misstatements was sufficient to render the trial fundamentally unfair. Accordingly, we affirm Brooks's conviction.

### II. Sentencing Phase – Propriety of Restitution for Security Costs

Brooks also challenges the trial court's decision to award direct victim restitution for security-related items, specifically, installation of a home alarm system, new door

11

locks, and deadbolts. He contends that restitution for these items is not authorized under section 1202.4 (the restitution statute)—specifically, subdivision (f)(3)(J)—because his conviction was not for a "violent felony" as defined in section 667.5, subd. (c).[12]

Initially, we address the People's contention that defense counsel forfeited Brooks's challenge to the restitution order by failing to object at sentencing. In another context, this argument might be more compelling; the question presented here, however, may be raised for the first time on appeal. (*People v. Martinez* (2017) 10 Cal.App.5th 686, 721 [argument that restitution order constituted legal error, if it does not require resort to the record or remand for further findings, not subject to forfeiture].) By contrast, Brooks's contention that he should not have to pay for the installation of front and rear door locks because the record below reflected no evidence of such expenses raises a factual issue, which is subject to forfeiture. (*In re Sheena K.* (2007) 40 Cal.4th 875, 887.) As there is no evidence that defense counsel raised this objection, below or in Brooks's opening brief on appeal, we treat it as waived. (*Ibid.*; *Children's Hospital & Medical Center v. Bonta* (2002) 97 Cal.App.4th 740, 777 [points not raised in opening brief may be treated as waived on appeal], disapproved on another ground in *Asante v. California Department of Healthcare Services* (9th Cir. 2018) 886 F.3d 795, 802, fn. 14.) Accordingly, we address only Brooks's contention that the statute precludes restitution for security costs in convictions for nonviolent felonies.

## A. California's Restitution Law

[12] After the briefing was complete, defendant sought leave to submit a supplemental brief to address intervening authority on the restitution issue, specifically, *People v. Salas* (2017) 9 Cal.App.5th 736 (*Salas*), which we granted. In response, the Attorney General acknowledged the holding of *Salas* and conceded the issue. However, in light of yet another case, *People v. Henderson* (2018) 20 Cal.App.5th 467, review granted May 23, 2018, S247716 (*Henderson*), which has since issued and directly conflicts with *Salas*, we decline to accept the Attorney General's concession. The right to restitution, which is constitutional, cannot be waived by the prosecution. (*People v. Valdez* (1994) 24 Cal.App.4th 1194, 1203 [constitutional origins of restitution]; *People v. Gross* (2015) 238 Cal.App.4th 1313, 1318 ["[a] victim's right to restitution is . . . a constitutional one; it cannot be bargained away or limited, nor can the prosecution waive the victim's right to receive restitution"].)

Under our state's restitution scheme, convicted criminals may be required to pay three types of restitution: a fine, set at the discretion of the court and commensurate with the seriousness of the offense, which is paid into a state fund used to compensate victims; direct restitution, primarily for economic loss sustained by the victims as a result of the defendant's conduct; or restitution as a condition of probation. (*People v. Giordano* (2007) 42 Cal.4th 644, 651–652 (*Giordano*).)

This appeal concerns direct restitution, the right to which was created in 1982 when California voters passed Proposition 8, also known as the Victims' Bill of Rights. (*Giordano*, *supra*, 42 Cal.4th at p. 652.) The initiative added article I, section 28, subdivision (b) to the Constitution (*Giordano*, at p. 652), which in its current form establishes specific, enumerated rights "[i]n order to preserve and protect a victim's rights to justice and due process." (Cal. Const., art. I, § 28, subd. (b).) Among those rights is direct restitution, which is defined expansively: "(A) It is the unequivocal intention of the People of the State of California that all persons who suffer losses as a result of criminal activity shall have the right to seek and secure restitution from the persons convicted of the crimes causing the losses they suffer. (B) Restitution shall be ordered from the convicted wrongdoer in every case, regardless of the sentence or disposition imposed, in which a crime victim suffers a loss." (*Id.,* subds. (b)(13)(A), (B).) As these rights are not self-executing, the Legislature was directed to adopt implementing legislation. (*Giordano,* at p. 652 [discussion on earlier version of the Bill of Rights].) The array of laws subsequently passed was eventually consolidated into section 1202.4. (*Giordano*, at p. 653.)

Initially, subdivision (f) of section 1202.4 provides, in pertinent part, "in every case in which a victim has suffered economic loss as a result of the defendant's conduct, the court shall require that the defendant make restitution to the victim or victims in an amount established by court order, based on the amount of loss claimed by the victim or victims or any other showing to the court." (§ 1202.4, subd. (f).) It further states, "The court shall order full restitution." (*Ibid*.)

Section 1202.4, subdivision (f) is followed by numbered parts (1)–(3). Subdivision (f)(1) states that "[t]he defendant has a right to a hearing before a judge to dispute the determination of the amount of restitution," describes the manner for modifying a restitution order, and authorizes victim testimony via audio or video transmission. (§ 1202.4, subd. (f)(1).) Subdivision (f)(2) concerns rights that third parties and the State Restitution Fund may have in a victim's direct restitution order. (*Id.*, subd. (f)(2).) Subdivision (f)(3) (relied upon by Brooks) provides: "To the extent possible, the restitution order shall be prepared by the sentencing court, shall identify each victim and each loss to which it pertains, *and shall be of a dollar amount that is sufficient to fully reimburse the victim or victims for every determined economic loss incurred as the result of the defendant's criminal conduct, including but not limited to, all of the following*" (§ 1202.4, subd. (f)(3), italics added.) Subdivisions (f)(3)(A)–(L), which follow, describe various compensable economic losses, such as the value of damaged or stolen property, medical and mental health counseling expenses, and lost wages. (*Id.*, subds. (f)(3)(A)–(L).)[13] Some of these provisions also include guidance for valuing a given loss. (*Id.*, subds. (f)(3)(A), (D), (E), (G), (I), (L).) And one part, concerning relocation expenses to move away from the defendant, imposes a verification requirement. (*Id.*, subd. (f)(3)(I).)

Subdivision (f)(3)(J), relied upon by Brooks, provides restitution for "[e]xpenses to install or increase residential security . . . including but not limited to, a home security device or system, or replacing or increasing the number of locks," so long as they are "incurred related to a violent felony, as defined in subdivision (c) of Section 667.5." (§ 1202.4, subd. (f)(3)(J).)

## B. Applicable Standard of Review

The People argue that we review the trial court's restitution decision for an abuse of discretion. Here, however, Brooks contends that the trial court erroneously construed

---

[13] The list includes one type of compensable *noneconomic* loss arising from certain sex crimes committed against children. (§ 1202.4, subd. (f)(3)(F).)

14

section 1202.4, subdivision (f), to permit an award of restitution for security improvements following a nonviolent felony because subdivision (f)(3)(J) impliedly precludes such an award. We are thus presented with a pure question of law which we review de novo. (*In re Eric S.* (2010) 183 Cal.App.4th 1560, 1564.) In any event, an order which rests upon "a demonstrable error of law" constitutes an abuse of discretion. (*People v. Duong* (2010) 180 Cal.App.4th 1533, 1537.)

### C. The Parties' Arguments

Brooks argues that because section 1202.4, subdivision (f)(3)(J)'s provision specifically allows court-ordered restitution for security costs *related to a violent felony*, the principle of *expressio unius est exclusion alterius* ("the enumeration of things to which a statute applies is presumed to exclude things not mentioned") applies, and we should infer that security costs related to nonviolent felonies are impliedly barred. (*Gonzalez v. Santa Clara County Department of Social Services* (2014) 223 Cal.App.4th 72, 90 [defining *expressio unius* principle].) He contends that a contrary interpretation would render subdivision (f)(3)(J) superfluous, which is not permitted. Finally, he argues that security improvements are not necessary to make a victim of a nonviolent felony whole, but constitute a windfall to the victim, contrary to the purposes of the statute. In his supplemental brief, Brooks reiterates these arguments and additionally cites *Salas* for the proposition that the Legislature's decision to revise subdivision (f)(3)(J) to add the limitation to violent felonies weighs in favor of a narrow reading.

The People respond that Brooks's reading of the statute is unduly narrow and that subdivision (f)(3)'s list of compensable losses is illustrative, not exclusive. The People also argue that so long as a loss is proven, the sentencing court may exercise its discretion to order direct restitution for the loss under the more general authorization in section 1202.4, subdivision (f).[14] The People's interpretation of the restitution statute is supported by *Henderson*, *supra,* 20 Cal.App.5th 467, review granted, which was decided

---

[14] In its supplemental brief, the People conceded the holding of *Salas, supra*, and effectively abandoned its opposition; however, for the reasons explained in footnote 12, *ante*, we do not accept this concession.

after the parties submitted their supplemental briefs and which creates a split in authority on the issue presented.

### D. Discussion

"A fundamental rule of statutory construction is that a court should ascertain the intent of the Legislature so as to effectuate the purpose of the law. [Citations.] In construing a statute, our first task is to look to the language of the statute itself. [Citation.] When the language is clear and there is no uncertainty as to the legislative intent, we look no further and simply enforce the statute according to its terms. [Citations.] [¶] Additionally, however, we must consider [statutory language] in the context of the entire statute [citation] and the statutory scheme of which it is a part. 'We are required to give effect to statutes "according to the usual, ordinary import of the language employed in framing them." [Citations.]' [Citations.] ' "If possible, significance should be given to every word, phrase, sentence and part of an act in pursuance of the legislative purpose." [Citation.] . . . "When used in a statute [words] must be construed in context, keeping in mind the nature and obvious purpose of the statute where they appear." [Citations.] Moreover, the various parts of a statutory enactment must be harmonized by considering the particular clause or section in the context of the statutory framework as a whole. [Citations.]' [Citations]." (*DuBois v. Workers' Comp. Appeals Bd.* (1993) 5 Cal.4th 382, 387–388.)

Subdivision (f)(3)(J) states that the court's restitution order "shall be of a dollar amount that is sufficient to fully reimburse the victim or victims for every determined economic loss incurred as a result of the defendant's criminal conduct, including but not limited to, all of the following: [¶] . . . [¶] (J) Expenses to install or increase residential security related to a violent felony . . . ." (§ 1202.4, subd. (f)(3)(J).) (As noted, there is no dispute that Brooks's conviction was for a *nonviolent* felony.) By its own terms, this provision requires the court's restitution order to be for an amount sufficient to reimburse security expenses related to violent felonies. (*Henderson, supra*, 20 Cal.App.5th at p. 471, rev. granted.) It establishes a minimum. No language supports the contention that it somehow precludes restitution to victims of nonviolent felonies.

16

Brooks's reliance upon the principle of *expressio unius est exclusion alterius* is improper. It has long been held that it does not apply to an item in an illustrative list, such as we have here, as indicated by the language "including, but not limited to."[15] (*People v. Richards* (1927) 86 Cal.App. 86, 89. See also *Estate of Banerjee* (1978) 21 Cal.3d 527, 540 [declining to apply maxim of *expressio unius* because "includes" is "not ordinarily understood as expressing an intent to limit"].) In *Banerjee,* the court considered a similarly constructed statute: a general phrase making all intangible personal property in California taxable "including" particular stocks; it declined to find, by implication, that other types of stocks not expressly mentioned, though intangible property, were not taxable. (*Id.* at pp. 531–532, 540–541.) Furthermore, Brooks's construction renders the "including but not limited to" language mere surplusage. (*People v. Valencia* (2017) 3 Cal.5th 347, 357 [such constructions not permitted]; *Henderson, supra,* 20 Cal.App.5th at p. 473 [rejecting identical application of expressio unius], rev. granted.)

The *expressio unius* doctrine "is most properly viewed as a preference or guideline which must be balanced against other indications of legislative intent, and must yield when they preponderate against it." (*Gonzalez v. Santa Clara County Department of Social Services, supra,* 223 Cal.App.4th at p. 90.) It " '[i]s not immutable and is inapplicable if its operation would contradict a discernible and contrary legislative intent.' " (*People v. Thurston* (2016) 244 Cal.App.4th 644, 665.)[16] Here, the context—

---

[15] The usual, ordinary meaning of this phrase renders the list that follows illustrative, not exhaustive. (See *People v. Keichler* (2005) 129 Cal.App.4th 1039, 1046 ["Because the statute uses the language 'including, but not limited to' these enumerated losses, a trial court may compensate a victim for any economic loss which is proved to be the direct result of the defendant's criminal behavior, even if not specifically enumerated in the statute"].)

[16] In *People v. Thurston, supra,* 244 Cal.App.4th 644, this court discerned from ballot pamphlet arguments the electorate's intent in enacting by initiative the Three Strikes Reform Act of 2012; although none of the ballot pamphlet arguments bore directly on the statutory interpretation question at issue, this court found that the general purposes of the Act, as expressed by the ballot arguments in its favor, precluded the

including the history and structure of the statute—mitigates against the application of *expressio unius*. Importantly, victim restitution rights derive from the Constitution, as amended through initiative. (*Giordano, supra*, 42 Cal.4th at p. 652.) Section 1202.4 constitutes implementing legislation, and it must be read in harmony with, and through the lens of, the Constitution. (*People v. Whisenand* (1995) 37 Cal.App.4th 1383, 1390.)

Our Constitution reflects the voters' "unequivocal" intent to ensure "that *all persons* who suffer losses as a result of criminal activity shall have the right to seek and secure restitution from the persons convicted of the crimes causing the losses they suffer" and specified that this right applies in "*every case*, regardless of the sentence or disposition imposed, in which a crime victim suffers a loss." (Cal. Const. art. I, § 28, subds. (b)(13)(A), (B), italics added.) Section 1202.4, subdivision (f) echoes that broad mandate, requiring restitution "in *every case* in which a victim has suffered economic loss as a result of the defendant's conduct," and then states, "[t]he court shall order *full restitution*." (§ 1202.4, subd. (f), italics added.)

By contrast, subdivisions (f)(1)-(2) address matters more fairly characterized as procedural—affecting the right to be heard, modes of victim testimony, modification of restitution orders, and rights of third parties. (See § 1202.4, subds. (f)(1)-(2).) Similarly, subdivision (f)(3) governs the preparation and contents of the restitution *order*. Specifically, the order must award restitution in an amount sufficient to reimburse all economic losses determined to have resulted from defendant's criminal conduct, including but not limited to the list of items set forth in subdivisions (f)(3)(A)-(L). Subdivisions (f)(3)(A)-(L) list types of restitution commonly awarded to crime victims. Several of these subparts specify how certain types of restitution must be calculated, and one imposes a requirement for third party verification of need, ostensibly to prevent abuse. (*Id.,* subds. (f)(3)(A), (D), (E), (G), (I), (L), (I).)

---

application of *expressio unius*. (*Thurston*, at pp. 665–666.) Similarly, another division of this court has declined to apply the maxim where doing so would run counter to a well-established principle of law. (*Arntz Builders v. Superior Court* (2004) 122 Cal.App.4th 1195, 1205.)

18

In this context, it becomes apparent that these subparts are not intended to define a victim's substantive right to restitution, but to ensure those rights will be fully vindicated by identifying common types of restitution and providing guidance for calculating the proper measure of damages. In other words, subdivision (f)(3)(J) must be construed to set a floor, not a ceiling. The provision should not be interpreted to impliedly limit—or vitiate—victims' constitutional rights.

The authorities cited by Brooks are distinguishable and unpersuasive. *Dyna-Med, Inc. v. Fair Employment & Housing Com.* (1987) 43 Cal.3d 1379 concerned an administrative agency's ability (or lack thereof) to impose punitive damages. The statutory list of remedies following the phrase "including, but not limited to," were corrective and equitable, not punitive or deterrent. (*Id.* at pp. 1387–1388.) Nonetheless, the court found that the application of *expressio unius* was consistent with, and supported by, the following: general tenets of administrative law; the commission's failure to construe the statute to allow punitive damages until 20 years after the statute was enacted; the inability of other administrative agencies to award punitive damages; other provisions of the statute concerning permissible remedies; and the fact that, unlike Civil Code section 3295 governing punitive damages in civil actions, the applicable statutes and regulations contained no comparable guidelines for the award of punitive damages. (*Dyna-Med, Inc.*, at pp. 1388–1392.) Here, comparable considerations weigh *against* the maxim's application.

Brooks also relies upon *People v. Thygesen* (1999) 69 Cal.App.4th 988 which, he argues, holds that the purpose of the restitution statute is to make a victim whole, not to grant a windfall. While we do not dispute that general principle, *Thygesen* concerned the measure of loss, not the implied abrogation of restitution for an entire category of crimes. (*Id.* at p. 995.) In any event, *Thygesen* supports our view that "the list of factors to be considered in subsections (A) through (G) is not exclusive. Section 1202.4, subdivision (f)(3) specifically states that in determining what is a loss, the trial court shall consider, but is not limited to the factors in subsections (A) through (G)." (*Thygesen*, at p. 994.)

19

Finally, *People v. Fortune* (2005) 129 Cal.App.4th 790, 793 concerned the court's method of calculation of restitution and found no error, as the trial court interpreted the applicable subdivision of section 1202.4 consistently with other law, so that the victim would not receive more than the value of the property which was fraudulently taken. (*Fortune*, at pp. 795–795.) It declined to set restitution at the higher amount measured by the benefit to the criminal defendant. (*Ibid.*) Here, we face no such discrepancy.

Our application of statutory construction principles is also supported by other decisions which are not directly on point, but are analogous and instructive. In *People v. Moore* (2009) 177 Cal.App.4th 1229, the court considered restitution for wages lost as a result of the victim's voluntary attendance at trial. Subdivisions (f)(3)(D) and (E) expressly provide restitution for wages lost due to personal injury, caring for an injured minor victim, or for time spent as a witness or in assisting the police or prosecution; they do not mention voluntary court attendance. (§ 1202.4, subds. (f)(3)(D), (E).) Nonetheless, the Court of Appeal affirmed the award of restitution, reasoning that it is permitted "for any economic loss which is proved to be the direct result of the defendant's criminal behavior, even if not specifically enumerated in the statute" and that the "only limitation the Legislature placed on victim restitution is that the loss must be an 'economic loss incurred as the result of the defendant's criminal conduct.' " (*Moore*, at pp. 1231–1232, quoting *People v. Crisler* (2008) 165 Cal.App.4th 1503, 1508.)

In *People v. McCarthy* (2016) 244 Cal.App.4th 1096, a different division of this court construed section 1202.4, subdivision (f)(3)(F), which requires restitution for a psychological harm resulting from certain sex crimes against children. Although, at the time, subdivision (f)(3)(F) was expressly limited to "felony violations of Section 288," the court affirmed an order of direct restitution for a conviction under section 288.5 (reasoning, inter alia, that it was a "greater included offense"). It also observed that in light of a legislative and historical trend toward enlarging, not restricting, the availability

20

of restitution, an implied prohibition against restitution would not be appropriate. (*McCarthy*, at p. 1108.)[17]

These decisions support a liberal reading of subdivision (f) to allow restitution for all harms caused by a defendant's conduct, based upon the general language of subdivision (f), "without relying on the more specific language in section 1202.4, subdivision (f)(3)(I)." (*People v. Mearns* (2002) 97 Cal.App.4th 493, 503.) As such, we agree with the holding of *Henderson* that "where a victim incurs the economic loss of installing a security system as a direct result of a defendant's conduct, the trial court may include that amount in a victim restitution award regardless of the crime of conviction." (*Henderson, supra,* 20 Cal.App.5th at p. 472, rev. granted.)[18]

To the extent it holds otherwise, we disagree with *Salas, supra*, 9 Cal.App.5th 736. In reaching a contrary decision, the Fourth District Court of Appeal divined legislative intent from an amendment that was immaterial to the question presented and applied the canon of *expressio unius* without examining the constitutional origins of the substantive rights at issue in this case. (*Id*. at pp. 742–744.) We also disagree with the court's argument that provisions, in parallel subdivisions, for the manner of calculating particular losses somehow supports a narrow interpretation of section 1202.4, subdivision (f)(3)(J). (*Salas*, at p. 744.) As we conclude, those provisions aid the court in satisfying minimum constitutional standards. In any event, the stated premise (that the existence of a specific "measure of harm" provision, by implication, precludes a trial court from utilizing other, unspecified methods of calculation when appropriate) has been expressly rejected by another court of appeal. (*People v. Mearns*, *supra*, 97 Cal.App.4th at pp. 501–502.)

---

[17] Brooks cites *People v. Valenti* (2016) 243 Cal.App.4th 1140, which interpreted section 1202.4, subdivision (f)(3)(F) in a contrary manner. As *McCarthy*, *supra*, 244 Cal.App.4th 1096 was subsequently decided and the statute was later amended to add section 288.5, we are not persuaded.

[18] We note, however, that *Henderson*'s analysis treats the restitution statute as the source of victims' substantive rights, rather than implementing legislation. (*Henderson*, *supra*, 20 Cal.App.5th at pp. 470–472, rev. granted.)

Accordingly, we hold that the statute permits restitution for security costs incurred by the victim of a nonviolent felony, notwithstanding the more specific provisions in section 1202.4, subdivision (f)(3)(J) requiring the court to award such restitution to the victim of a violent felony.

## DISPOSITION

The judgment is affirmed in all respects.

_____
Kline, P.J.

We concur:

_____
Stewart, J.


_____
Miller, J.

*People v. Brooks* (A147410)

23

Trial Judge:                                   Hon. Nancy Davis Stark

Trial Court:                                  Contra Costa County Superior Court

Attorney for Appellant:             Under Appointment by the Court of Appeal
Michele Kemmerling


Attorneys for Respondent:         Attorneys General of California
Xavier Becerra
Kamala D. Harris

Gerald A. Engler
Chief Assistant Attorney General

Jeffrey M. Laurence
Senior Assistant Attorney General

Donna M. Provenzano
Supervising Deputy Attorney General

Christina Vom Saal
Deputy Attorney General