Filed 9/1/22  P. v. Robles CA2/2

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| THE PEOPLE, | B315789 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. KA119775) |
| v. | |
| JOSE LUIS ROBLES, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Los Angeles County Superior Court, Juan Carlos Dominguez, Judge.  Affirmed.

Theresa Osterman Stevenson, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Assistant Attorney General, Noah P. Hill and Thomas C. Hsieh, Deputy Attorneys General, for Plaintiff and Respondent.

\* \* \* \* \* \*

Jose Luis Robles (defendant) appeals his convictions for several child sex crimes against his stepdaughters as well as the restitution award to compensate them for the pain and suffering his crimes inflicted.  We conclude there was no error, and affirm.

## FACTS AND PROCEDURAL BACKGROUND

### I.      Facts

#### A.      *Defendant becomes a stepfather to two daughters*

Julieta M. (mother) has several children, including I. (born April 2004) and Natalie (born May 2005).  In September 2013, mother married defendant.  Although I. and Natalie were still in touch with their biological father, defendant soon occupied a "parental" role as their stepfather.

#### B.      *Defendant repeatedly molests I. in 2014*

##### 1.      *Vaginal penetration*

One day prior to August 27, 2014, and when I. was nine or ten years old, defendant went into I.'s bedroom, pulled down her underwear, rubbed his fingertip along I.'s vaginal labia, and for 30 seconds inserted his finger approximately one-quarter to one-half inch between her labia in order to rub her clitoris.  I. was "very uncomfortable," but did not resist and did not report the incident because she was "scared" of defendant due to his tendency to "lash out" by "screaming" and hitting her if he was upset.

2

### 2. *Forced masturbation*

On two or three occasions prior to August 27, 2014, while I. was nine or ten years old, defendant lay next to I., wrapped her hand around his naked and erect penis, and with his hand above hers, forced her to stroke his penis until he ejaculated on her hand. Although defendant told I. he would not do it again after the first time, he engaged in the same behavior one or two more times. Defendant told her not to tell others about it.

### 3. *Grinding against I.'s buttocks*

On another day prior to August 27, 2014, defendant entered I.'s room, laid down beside her, pulled down her pajamas and underwear, pushed his erect penis against her buttocks, and held her tightly while rubbing his penis to and fro.

### C. *Defendant repeatedly molests Natalie in 2014*

A few months before August 27, 2014, defendant lay next to Natalie in her bed after he had a fight with mother. Natalie was "around nine" years old at the time. Natalie woke to find that defendant had wrapped the fingers of her right hand around his naked and erect penis, and was moving her hand up and down. When she asked him what he was doing, defendant said, "Nothing." Natalie fell back asleep, and awakened again to find that defendant had resumed moving her hand on his penis until he ejaculated. He then told her to go wash her hands. Defendant told her not to tell anyone what had happened. Natalie did not stop defendant or tell anyone about defendant's conduct because she was afraid of him because he "gets mad for everything."

### D. *Natalie reports abuse, as does I., and defendant is kicked out of the family home*

Natalie did not immediately report what defendant did to her. It was not until a few months later—on August 27, 2014—

that she told an usher at her church, who then told the pastor, who then confronted defendant. When the family returned home from church that day, mother asked I. if defendant had molested her as well. That is when I. admitted the abuse she had suffered at defendant's hands.

Because the pastor had reported the abuse to the police, officers showed up at the family's apartment the next day. By then, however, mother had moved herself and the girls out of the apartment and instructed the girls to lie and deny any abuse by defendant. After all leads on the family's whereabouts hit dead ends, the police halted their investigation.

### E. *Mother reconciles with defendant, who moves back in and resumes his molestation of Natalie*

Although mother insisted upon divorcing defendant once his sexual abuse came to light, within a year she reconciled with him and he moved back in with the family. In 2018, they remarried.

In 2018, when Natalie was 13 years old, defendant grabbed Natalie's breasts through her clothing, squeezing and massaging them in a circular motion. He told her to "keep it a secret" and not say anything. Defendant did the same thing on another seven or eight occasions.

### F. *Natalie reports abuse when calling a suicide hotline*

Already feeling that mother had chosen defendant over protecting her, Natalie started feeling suicidal after defendant started groping her breasts in 2018. She started using razor blades to cut herself. She eventually called a suicide hotline. During that call, she reported defendant's sexual abuse. The

4

hotline referred the matter to the police, who reopened the dormant case from 2014.

### G. *Defendant's changing story*

To the pastor and mother at the church (and before mother asked defendant if he had molested I.), defendant admitted to molesting Natalie.

To the police when they first approached him to arrest him in 2018, defendant spontaneously said, "I know why you're here," and "I am ready to face whatever needs to be done."

To the police during a subsequent, video-recorded interview, defendant admitted to touching I.'s vagina and forcing I. to masturbate him on multiple occasions. He denied that he did anything to Natalie, declaring that Natalie "lies all the time." Defendant told the police that he had told the pastor he had molested Natalie only because he was just "[going] along with what was being said at the time."

## II. Procedural Background

### A. *Charges*

In the operative first amended information, the People charged defendant with (1) four counts of committing a lewd act upon a child 14 years or younger (Pen. Code, § 288, subd (a))[1] for (a) forcing I. to masturbate him in 2014 (count 4), (b) putting his erect penis against I.'s buttocks in 2014 (count 8), (c) forcing Natalie to masturbate him in 2014 (count 1), and (d) groping Natalie's breasts in 2018 (count 2), and (2) one count of sexual penetration with a child 10 years or younger (§ 288.7, subd. (a)) for inserting his fingertip between I.'s labia in 2014 (count 3). The People further alleged that defendant had committed his

---

[1] All further statutory references are to the Penal Code unless otherwise indicated.

crimes against multiple victims within the meaning of our State's One Strike Law (§ 667.61, subds. (b) & (e)).

### B.   *Preliminary hearing*

Both I. and Natalie testified at defendant's preliminary hearing.  During her testimony, Natalie denied that defendant touched her breasts in 2018.

### C.   *Trial*

The matter proceeded to a jury trial.

I. and Natalie testified to the various incidents of sexual molestation set forth above.  Natalie explained that the reason she had denied that defendant touched her breasts during her preliminary hearing testimony was that she did not want her mother "to get the same consequences."  (Mother had been charged with being an accessory after the fact (§ 32), but ultimately pled no contest to a misdemeanor count of child endangerment.)

The People called a clinical psychologist as an expert to testify about child sexual abuse accommodation syndrome, as a means of explaining why Natalie and I. had quietly submitted to defendant's sexual abuse, had delayed in reporting that abuse, and why Natalie's disclosures were partial.

Defendant took the stand in his defense.  He flatly denied ever touching I. or Natalie.  He asserted that he had falsely confessed to the pastor because mother had "nag[ged]" him into confessing.  He asserted that the police were lying about the spontaneous statements he made at the time of his arrest.  And he asserted that he falsely confessed to molesting I. during his videotaped interview because the interviewing officer had promised to "help [him]" and that everything would "be over" if defendant specifically admitted to "touch[ing I.] two or three

6

times and [that I.] masturbated [him]." Defendant testified that I. and Natalie had fabricated the charges because they wanted to be with their biological father.

The jury found defendant guilty of all charges and found true the special allegation.

### D.    *Sentencing and restitution*

The trial court sentenced defendant to prison for 45 years to life. Specifically, the court imposed three consecutive sentences of 15 years to life for two of the lewd act convictions (the ones involving defendant forcing I. and Natalie to masturbate him) and the sexual penetration conviction, and ran the remaining two 15 year to life sentences concurrently.

The People asked the trial court to award I. and Natalie restitution for the pain and suffering defendant inflicted upon them by virtue of his sexual abuse. Through testimony during the trial and at the sentencing hearing, both girls testified to the impact of defendant's sexual abuse: Natalie testified that she continues to have emotional problems "almost every day," still cries and has trouble sleeping because of the incidents, has engaged in self-cutting behavior, has considered suicide multiple times, and is still in mental health counseling; I. testified that she suffered depression "for a little bit," continues to suffer from weekly anxiety attacks, still thinks about the abuse and gets emotional thinking about it, still has trouble sleeping, and is still in mental health counseling. Both girls are also now in the foster care system because defendant's sexual abuse and mother's willingness to subject them to it placed the girls in the juvenile dependency system; now they live apart and in foster homes, from which Natalie has run away several times. The trial court recognized the difficulty of fixing an amount of noneconomic

7

damages, and invited supplemental briefing from both parties. The People filed a supplemental brief. The court subsequently issued a written order finding that defendant had "severely traumatized" I. and Natalie "on a number of occasions," that this severe trauma has "detrimentally affected their everyday life," and that the girls "will continue to endure psychological pain and distress caused by the acts of the defendant" "for possibly the rest of their lives." As its "best estimation of the amount of money which will minimally compensate these victims for what they have and will continue to endure," the court awarded each girl $332,500 in restitution for their pain and suffering—calculated as $350,000 minus five percent to account for mother's conduct in "allowing the defendant to return to live at the home" with knowledge of his molestation and in having the girls lie to the police about his abuse.

### E. *Appeal*

Defendant filed a timely notice of appeal.

## DISCUSSION

Defendant raises three arguments on appeal—two aimed at his convictions and one at the restitution order. First, he argues that the trial court erred in admitting evidence that he, on one occasion, threatened to use a belt to punish Natalie. Second, he argues that the pattern jury instruction used to limit the jury's use of the expert's opinion on child sexual abuse accommodation syndrome (CALCRIM No. 1193) injected error into his trial. Lastly, he argues that the amount of restitution awarded was arbitrary and excessive.

## I. Evidentiary Issue

At trial, Natalie testified to one incident where defendant had threatened to beat her with a braided belt after he got upset

with her for wanting to shower instead of fold laundry; mother intervened and "block[ed] him" before he touched Natalie. Prior to trial, the trial court—over defendant's Evidence Code section 352 objection—had held that this incident was admissible because it was "highly" "probative" to explain Natalie's fear of defendant (and thus why Natalie did not immediately report defendant's sexual abuse), and that this probative value outweighed the prejudicial impact of the incident. Defendant argues that this ruling was error. We review such rulings for an abuse of discretion. (*People v. Peoples* (2016) 62 Cal.4th 718, 743.)

Section 352 grants trial courts the "discretion" to "exclude evidence if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury." (Evid. Code, § 352.)

The trial court did not abuse its discretion in admitting Natalie's testimony about the belt incident. Both Natalie and I. testified that they were "scared" of defendant, and that their fear of him is partly why they did not stop or immediately report his abuse. (Natalie also testified that she did not report the 2018 abuse partly because she also feared mother would not support her.) The belt incident is a concrete example of how defendant would "lash out" and "get mad at everything," which the girls otherwise testified to without objection. Thus, the belt incident is highly probative in explaining the victims' delayed disclosure of the sexual abuse, and hence probative to rebut the inference of lack of credibility that might arise from their delayed disclosure. Contrary to what defendant suggests, this probative value is not

speculative.  (Cf. *People v. Brady* (2005) 129 Cal.App.4th 1314, 1337-1338.)  The evidence was certainly prejudicial to the extent it was not flattering to defendant.  But "'undue prejudice'" for purposes of section 352 means that the evidence is likely to evoke an "emotional reaction" from the "jurors."  (*People v. Valdez* (2012) 55 Cal.4th 82, 145.)  And compared to the far more egregious charges at issue, evidence that defendant made an unfulfilled threat to physically harm Natalie was not likely to evoke an emotional reaction that substantially outweighs the probative value of this evidence.

Defendant resists this conclusion with what boil down to two further arguments.  First, he argues that the belt incident has minimal or no probative value because it involved only Natalie and occurred in 2018, and because Natalie did not delay in disclosing his postincident groping of her breasts in 2018.  We reject this argument.  To begin, there *was* delayed disclosure in 2018 because defendant subjected her to eight or nine incidents before she reported it.  Further, the belt incident is evidence of defendant's overall hot-headedness, which *both* Natalie and I. testified was part of the reason they were "scared" of him and complied with his sexual advances without objecting or reporting them.  Second, defendant argues that the belt incident undercut his credibility, which was critical in a case where it was his word against the girls'.  This argument ignores that the prejudice from this evidence arises because it tends to show his tendency toward violence, which is wholly separate from his truthfulness.  (*People v. Beagle* (1972) 6 Cal.3d 441, 453 ["Acts of violence . . . generally have little or no direct bearing on honesty and veracity."], superseded by constitutional amendment on other grounds as

10

stated in *People v. Castro* (1985) 38 Cal.3d 301, 307-308; *People v. Holt* (1984) 37 Cal.3d 436, 457 [same].)

## II.    **Instructional Issue**

Expert testimony on child sexual abuse accommodation syndrome is admissible if (1) the testimony is "tailored to address the specific myth[s] or misconception[s] suggested by the evidence" in terms of how children react to sexual abuse, and (2) the jury is instructed that "the expert's testimony is not intended and should not be used to determine whether the victim's molestation claim is true." (*People v. Bowker* (1988) 203 Cal.App.3d 385, 391-394; *People v. Wells* (2004) 118 Cal.App.4th 179, 188; *People v. McAlpin* (1991) 53 Cal.3d 1289, 1301; *People v. Humphrey* (1996) 13 Cal.4th 1073, 1095-1096 (conc. opn. of Brown, J.).)

The first of these requirements was met. The expert's testimony in this case was "tailored to address specific myth[s] and misconception[s]" about how child abuse victims react: The expert testified about how child sexual abuse victims—contrary to how "the public" might "expect [child-victims to] react[]"— typically "accommodate[]" the abuse by "pretend[ing] to be asleep," and how child-victims tend to make a "delayed" or "partial disclosure" of the abuse they suffer. This testimony countered defendant's videotaped confession, defendant's trial testimony and the defense attorney's argument—all of which portrayed Natalie and I. as lying about the abuse.

Defendant disputes whether the second requirement was satisfied by the trial court's reading of the pattern CALCRIM No. 1193 instruction. We evaluate this challenge to the jury instructions de novo. (*People v. Mitchell* (2019) 7 Cal.5th 561, 579.)

11

We conclude that the CALCRIM No. 1193 instruction sufficiently instructed the jury that the expert's testimony was not to be used to evaluate whether Natalie and I. were, in fact, abused. As given in this case, the instruction provides:

"You have heard testimony from Dr. Jayme Jones regarding child sexual abuse accommodation syndrome.

"Dr. [Jones's] testimony about child sexual abuse accommodation syndrome is not evidence that the defendant committed any of the crimes charged against him.

"You may consider this evidence only in deciding whether or not Natalie['s] and/or [I.'s] conduct was not inconsistent with the conduct of someone who has been molested, and in evaluating the believability of their testimony."

Every court to have considered this instruction has found it to be sufficient to satisfy the requirements for admitting child sexual abuse accommodation syndrome expert testimony. (See *People v. Gonzales* (2017) 16 Cal.App.5th 494, 503-504; *People v. Lapenias* (2017) 67 Cal.App.5th 162, 175-176; *People v. Munch* (2020) 52 Cal.App.5th 464, 473-474.) We agree with the reasoning and holdings of these cases.

Defendant nevertheless proffers five bases upon which to disregard or distinguish this solid wall of precedent.

First, defendant argues that CALCRIM No. 1193, by allowing a jury to treat inconsistencies in a child witness's reporting of the abuse as "not inconsistent with the conduct of someone who has been molested," "in essence" allowed Natalie to use the inconsistencies in her reporting of abuse as proof that she was a credible witness, thereby "improperly bolstering her credibility." We disagree. "A reasonable juror would understand CALCRIM No. 1193 to mean that the jury can use" the expert's

12

testimony as a basis for concluding that Natalie was not unbelievable merely because she engaged in the seemingly "self-impeaching behavior" of delaying and inconsistently reporting the abuse she suffered.  (*Gonzales*, *supra*, 16 Cal.App.5th at p. 504.)  If this particular use of the expert's testimony were enough, as defendant asserts, to render it inadmissible, then expert testimony on child sexual abuse accommodation syndrome would *never* be admissible—a holding that would require us to disregard our Supreme Court's decision in *McAlpin*.  (Accord, *Auto Equity Sales, Inc. v. Superior Court* (1962) 57 Cal.2d 450, 455 [appellate courts may not disregard Supreme Court precedent].)

Second, and relatedly, defendant argues that CALCRIM No. 1193 is confusing because it provides that a jury may consider the expert's testimony about child sexual abuse accommodation syndrome "only in deciding whether [the victim's] conduct was *not inconsistent* with the conduct of someone who has been molested, in evaluating the believability of [her] testimony."  (Italics added.)  Defendant urges that the double negative is confusing and misleading.  We disagree.  By using the phrase "not inconsistent," CALCRIM No. 1193 conveys that the syndrome may be used to explain how a child-victim's counterintuitive conduct is *not inconsistent* with the victim telling the truth, effectively negating the weight of the victim's counterintuitive conduct.  That dovetails perfectly with the legal mandate that evidence of this syndrome may only be admitted to dispel the common myths and misconceptions about how child sex abuse victims typically react.  (*Bowker*, *supra*, 203 Cal.App.3d at pp. 391-394.)  Were CALCRIM No. 1193 to substitute the word "consistent" for the phrase "not inconsistent," the instruction

13

would allow the child victim's seemingly counterintuitive conduct to be used as affirmative evidence of the alleged molestation, thereby putting a thumb on the scale of the victim's credibility and ostensibly transgressing the limitation that evidence of this syndrome *not* "be used to determine whether the victim's molestation claim is true." (*Ibid.*) Thus, defendant's argument is wrong to equate the phrase "not consistent" with the word "consistent" in the context of this instruction, and his argument based on this false equivalency necessarily crumbles.

Third, defendant argues that CALCRIM No. 1193 does not sufficiently advise jurors that they may *not* use the syndrome evidence for any purpose *other* than the one specified—namely, "*only* in deciding whether or not Natalie['s] and/or [I.'s] conduct was not inconsistent with the conduct of someone who has been molested, and in evaluating the believability of her testimony." (Italics added.) The "Related Instructions" for CALCRIM No. 1193, defendant notes, recommends that trial courts also instruct with CALCRIM No. 303—which reminds jurors that evidence "admitted for a limited purpose" may be "consider[ed] . . . only for that purpose and for no other"—whenever they instruct with CALCRIM No. 1193. The absence of an affirmative declaration of what is prohibited, defendant concludes, creates too great a risk of misuse of the syndrome evidence. We disagree. CALCRIM No. 1193 explicitly limits the use of the syndrome evidence by stating the "only" purpose for which it may be considered. A further instruction to effectively add "only *and for no other* [purpose]" is duplicative and, at bottom, an unnecessary set of "suspenders" for the proverbial "belt" of CALCRIM No. 1193.

Fourth, defendant argues that CALCRIM No. 1193 left the door open for the prosecutor to impermissibly argue that the

14

inconsistencies in Natalie's and I.'s testimony constituted affirmative evidence in favor of their credibility. Yet the prosecutor's allegedly offending argument is no more than the legitimate argument that "how [the girls] disclosed" and "the method of their disclosure" were "consistent exactly with what [the expert] talked about" regarding the syndrome that explains the "unusual" "behavior" of "children" in reporting sexual abuse crimes.

Lastly, defendant argues that other jurisdictions either prohibit or place greater limitations on the admission of child sexual abuse accommodation syndrome evidence. We must follow California law.

## III. Restitution

Defendant argues that the trial court erred in awarding $332,500 in noneconomic, pain and suffering damages each to Natalie and I. Consistent with the constitutional imperative of Marsy's Law, section 1202.4 obligates a trial court to "order full restitution" to crime victims. (§ 1202.4, subds. (a)(1) & (f).) Restitution is usually confined to "economic loss incurred as the result of the defendant's criminal conduct" (*id.*, subd. (f)(3)), but can include "[n]oneconomic loss, including, but not limited to, psychological harm" for certain child sex crimes, including for the violations of sections 288 and 288.7 at issue in this case (*id.*, subd. (f)(3)(F)). Because noneconomic damages are "subjective, non-monetary losses including, but not limited to, pain, suffering, inconvenience, mental suffering, emotional distress, loss of society and companionship, loss of consortium, injury to reputation and humiliation" (Civ. Code, § 1431.2, subd. (b)(2)), "noneconomic loss is subjectively quantified" (*People v. Smith* (2011) 198 Cal.App.4th 415, 436 (*Smith*)). Thus, and because we

generally review restitution orders for an abuse of discretion (*People v. Giordano* (2007) 42 Cal.4th 644, 663-664), we must affirm a trial court's order awarding a specific amount of noneconomic damages as long as there is substantial evidence in the record to support such an award (*People v. Lehman* (2016) 247 Cal.App.4th 795, 804-805 (*Lehman*)), and as long as the amount "does not, at first blush, shock the conscience or suggest passion, prejudice or corruption on the part of the trial court." (*Smith*, at p. 436; *Lehman*, at pp. 801-802.)

The trial court did not abuse its discretion in awarding Natalie and I. each $332,500 in restitution because that amount does not "shock the conscience."  Based on their testimony at trial and at the sentencing hearing, substantial evidence supports the court's findings that defendant's criminal acts had "severely traumatized" them in a way that still caused them to "endure psychological pain and distress" at the time of the restitution hearing and that would continue to do so for "possibly the rest of their lives."  (Cf. *People v. Valenti* (2016) 243 Cal.App.4th 1140, 1182-1183 [restitution award for noneconomic damages is not supported by substantial evidence where "[t]here was no evidence, either through direct testimony or victim-impact statements, that the children suffered" adverse effects from the defendant's conduct], superseded by statute on other grounds as stated in *People v. Brooks* (2018) 23 Cal.App.5th 932, 946 & fn. 17.)  Based on this evidence, the trial court thoughtfully explained the type and degree of psychological harm each victim had suffered as well as its likely duration, discounted the full amount of harm by five percent to account for mother's contribution to that harm, and came up with the amount it did. (Accord, *Smith*, *supra*, 198 Cal.App.4th at p. 437 [noting

16

propriety of awarding restitution for future pain and suffering—that is, for pain and suffering that would continue after the restitution hearing].)

Defendant lodges three objections against the award in this case.

First, defendant argues our Supreme Court has decreed that restitution awards cannot be "be based merely upon the trial court's subjective belief regarding the appropriate compensation" (*People v. Carbajal* (1995) 10 Cal.4th 1114, 1125), and that the trial court in this case violated that decree by effectively pulling the restitution amounts out of thin air. This argument compares apples and oranges. *Carbajal* and its progeny deal with *economic* damages, not the *noneconomic* damages at issue here and which are, by definition, inherently subjective. (*Smith*, *supra,* 198 Cal.App.4th at p. 436.) To apply the standards for the former to the latter would be to prohibit any award of noneconomic damages. Because that is contrary to section 1202.4, it is contrary to the law.

Second, defendant argues that the trial court was obligated to engage in an intercase comparison of the noneconomic restitution awards in this case to the awards in other cases, and to assess them for proportionality vis-à-vis the degree of sexual abuse involved in all the cases. We reject this argument. It is unsupported by precedent: If there is no right to the "*intercase* proportionality review" of sentences (*People v. Lenart* (2004) 32 Cal.4th 1107, 1130, italics in original; *People v. Lewis* (2001) 25 Cal.4th 610, 677), there is certainly no right to such review of noneconomic restitution awards. Our refusal to engage in intercase proportionality review is also supported by policy: Undertaking such review would likely require us to reduce

17

awards on the grounds that the abuse in one case involved one type of sexual contact rather than another, that the abuse was continuous rather than intermittent, or that the child in one case was more resilient to the psychological damage from sexual abuse than another.  These entail judgments that may be contrary to law (accord, *People v. Taylor* (2011) 197 Cal.App.4th 757, 764 ["'[A] wrongdoer in criminal cases as in civil tort takes his victim as he finds [her].'"]), and are in any event based on nothing more than *our* subjective judgments.  In the end, our Legislature decided to award restitution for the pain and suffering of the victims of specified child sex crimes, notwithstanding that those awards would be inherently subjective.  And even if we were to engage in this exercise, the awards here are less than half of the $750,000 award upheld in *Smith* and the $900,000 award upheld in *Lehman*; by this absolute metric, the $332,500 awards in this case are not conscience shocking.

Lastly, defendant argues that the trial court in this case did not sufficiently explain why it attributed only five percent of fault to mother and why it elected not to use the worksheet the People provided as a method for calculating noneconomic damages (which asks the court to multiply the number of hours of harm in four different categories ("anguish, embarrassment, grief, etc."; "counseling"; "sleeplessness"; and "separation from siblings and other additional damages") suffered by each victim an hourly estimate of the compensation warranted for each category of psychological harm).  Ignoring that precise calculation is not required for noneconomic damages, defendant's arguments are not well taken.  The court *did* explain why it attributed only five percent of the girls' trauma to mother—namely, mother eventually allowed defendant to have access again to the girls but

18

that her culpability was mitigated somewhat by the fact that defendant was manipulating her. As the court put it, defendant was at all times "driv[ing the] vehicle." And we cannot ignore that *defendant* was the one who was actually molesting the girls; mother's failure to prevent defendant from engaging in these acts does not appreciably reduce his core responsibility for the damage wrought by his own conduct. The court's failure to use the People's worksheet is also of no moment: The worksheet itself is wholly subjective in terms of the categories it creates (as many seem to overlap) and in terms of the notion that a court can assign a different hourly amount of harm for "sleeplessness" and for "anguish, embarrassment, grief, *etc.*" The court's refusal to use an arbitrary mechanism for fixing damages does not cause the award in this case to shock the conscience.

## DISPOSITION

The judgment is affirmed.

NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS.


_____, J.

HOFFSTADT

We concur:


_____, P. J.

LUI


_____, J.

ASHMANN-GERST