Filed 3/29/23

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| JOANNA RIVERA,<br>　　　Plaintiff and Appellant,<br>v.<br>DAVID HILLARD,<br>　　　Defendant and Respondent. | A163818<br><br>(Marin County<br>Super. Ct. Nos. FL1903763,<br>FL1903800) |

　　　While their marriage dissolution proceeding was pending in Virginia, David Hillard and Joanna Rivera, previously known as Joanna Hillard, filed dueling requests for domestic violence restraining orders in Marin County Superior Court under the Domestic Violence Prevention Act (DVPA), Family Code section 6200 et seq.[1] After trial, the family court found both parties had committed domestic violence and issued mutual restraining orders. The court also found that Joanna[2] had obtained orders temporarily excluding David from his residence under false pretenses, and then damaged and confiscated substantial amounts of David's property, so it conducted a second hearing on restitution and issued a substantial award. Joanna challenges both the sufficiency of the findings supporting the mutual restraining orders and various aspects of the restitution award. We affirm.

---

　　　[1] Unless otherwise specified, further statutory references are to the Family Code.

　　　[2] As is customary in family law cases, we refer to the parties by their first names for purposes of clarity and not out of disrespect.

1

# BACKGROUND

The parties were married in 1999. At the time, David had substantial assets, some of which he used to buy a residence on Eagle Drive in the City of Novato, where the parties lived for much of their marriage, and some of which he liquidated to purchase stocks, bonds and other investments. A few years into the marriage, David left his employment to focus, full time, on managing these investments and began to diversify into nontraditional investment vehicles, such as precious metals, original artwork, antique firearms, wine, and watches. These items were located (along with purchase documentation) at Eagle Drive.

In August 2017, the parties and their two teenage children moved to Virginia. They maintained the Eagle Drive property, as well as a home in Lake Tahoe.

## 1. Dissolution Proceedings

David and Joanna separated in June 2018 and David filed for divorce in Virginia. A child-custody trial commenced that summer. In October 2018, the parties entered into a custody and support agreement (CSA). Section 2.7 of the CSA acknowledged David's ownership of Eagle Drive and provided "he shall have exclusive use and possession of said property upon execution of this agreement." The CSA was incorporated into a Virginia order in November 2018.

In August 2019, the parties entered into a mediated marital settlement agreement (MSA). It incorporated the CSA and provided, among other things, for separation, support and property division. With respect to Eagle Drive, it

obligated David to buy out Joanna's interest[3] by January 15, 2020. However, it also stated that the CSA "shall remain in full force and effect," leaving intact David's right to exclusive use and possession of the property.

The MSA further made each party the sole and separate owner of his or her personal possessions, such as jewelry, watches, purses, clothing, personal electronic devices, books and papers, and sports equipment. It provided "[a]ll artwork shall be David's sole and separate property" and set forth a process for appraisal and buyout or, alternatively, division of proceeds, in the event certain artwork was sold; a process for dividing wine located at Eagle Drive; and an agreement that, by December 31, 2019, the parties would reach a further agreement about how to divide personal property other than wine, art, and furniture. Finally, the MSA provided for the Virginia court to retain jurisdiction to divide any assets that "either party has failed to disclose" with a net value of $10,000 or more.

A final judgment of divorce was entered in the Virginia action on September 30, 2019.

### 2. The September 2019 Altercation and Aftermath

On September 25, 2019, David and Joanna had an altercation at Eagle Drive, where David was residing. Although they were separated, he had occasionally permitted Joanna to stay overnight.[4] Joanna had returned from Virginia the night before and, despite having a rental unit nearby, asked to stay for a night; David had reluctantly agreed. The next day, when she asked

---

[3] Although David disputes Joanna held any ownership in the property, the terms of the dissolution settlement are not disputed, and the ownership issue is not material, here.

[4] David represents, and Joanna does not dispute, that the parties had separated in June 2018 and began maintaining separate residences shortly thereafter.

to stay a second night, an argument ensued. David called the police to have Joanna removed. Before the police arrived, the parties tussled over a bottle of David's cologne and Joanna hit her elbow on a kitchen counter, causing a laceration.

The police arrested David and issued an emergency protective order, including an order to stay away from Eagle Drive. A box was checked on the form and order indicating that Joanna "lives with the person to be restrained and requests an order that the restrained person move out immediately from" Eagle Drive. When asked what she told the police, Joanna denied showing the police a driver's license listing Eagle Drive as her residence. She testified she told the police that she "was at the residence"; she could not recall whether she said she lived there.

### 3. The Parties Initiate Domestic Violence Proceedings

On October 2, 2019, Joanna filed a request for domestic violence restraining order (DVRO), including temporary restraining order (TRO). She alleged several incidents of domestic violence, including the September 25 altercation. She asked for an order excluding David from Eagle Drive and for control of the residence and all personal property located there. Joanna asserted a right to occupy the home, claiming she had a "community property interest" and describing it as "our family residence" and "our home" (despite having signed the CSA granting David exclusive possession).

On October 4, 2019, David filed his own request for DVRO. He asked the court to exclude Joanna from Eagle Drive and sought a "property control" order for the residence. He alleged the CSA had awarded him "exclusive use and possession" of the home and a divorce decree had been entered awarding

4

the residence to him.[5] David sought a "property restraint" order that Joanna "not . . . sell, hide, or get rid of or destroy any possessions or property, except in the usual course of business or for the necessities of life." Although David did not check box 21 for an order of restitution, he described in detail Joanna's entry into his office and desk and her eventual success in opening his safe, and expressed concern she might take his money and other personal property.

The family court granted Joanna's request for a TRO, among other things, temporarily excluding David from Eagle Drive. David's request for TRO was denied. Joanna remained in possession of Eagle Drive until January 12, 2020. In October, the court granted a civil standby for David to retrieve certain personal items from the premises.[6] During the months he was excluded from Eagle Drive, David incurred out-of-pocket expenses for lodging and a rental car.

When David was permitted to return to Eagle Drive, he "found a catastrophe." Rooms had been upturned, drawers forced open, and the attic and crawl spaces cleaned out. Joanna (with two "investigators") had thoroughly searched the house, breaking locks and hacking into David's computer. His computer and security cameras were damaged. Many items were missing, including hard drives, an office safe, cash, original artwork, jewelry, and ice chests full of gold and silver coins that had been stored in the garage attic and gun safe. Because paper receipts and David's check ledger

---

[5] This award was subject to the buy-out payment which was not yet due or paid.

[6] Joanna asserts that David and his attorney used this opportunity to surreptitiously remove from the property a carry-on suitcase full of gold, which David denies.

were also missing, and electronic records were no longer available for some items, David was unable to fully document his losses.

### 4. Trial of the Parties' Dueling Domestic Abuse Allegations

Over the course of four days in 2019 and 2020, the court heard testimony and received evidence on both restraining order requests. The parties submitted closing briefs, the matter was taken under submission and, on February 28, 2020, the court issued a detailed written order (the restraining order) ruling on their dueling requests.

The court found that, of Joanna's numerous abuse allegations, she proved two: first, during an argument in 2018, David became angry and threw various objects at Joanna and second, during the September 2019 incident described above, David "forcibly grabbed [Joanna]'s phone and threw it in the bushes." (The court found Joanna failed to prove her elbow laceration was the result of domestic violence.) The court issued a stayaway order against David.

The court also found that Joanna had committed abuse, following David's arrest and subsequent exclusion from Eagle Drive, by "confiscating and destroying [David]'s property," which "improperly disturbed [David's] peace in violation of section 6203." The court issued a stayaway order against Joanna and ordered her to vacate Eagle Drive. In discussing restitution, the court stated that Joanna must return the property she took and set a hearing date "to consider the amount of restitution owed, if any." It ordered David to file an accounting, including "all items specified in [David]'s testimony," and Joanna to file a response detailing items that had been returned or reimbursed.

While the restitution issue was pending, neither party appealed the restraining order.

6

### 5. The Restitution Trial

David filed an accounting and supporting documentation on June 30, 2020, alleging lost cash, lost property, and property damage in a total value exceeding $245,000. Joanna objected to restitution on various legal grounds (including the existence of the Virginia dissolution proceeding, and orders therein), admitted that she had taken $11,530 in cash but denied taking any of the other items set forth in David's accounting; and failed to dispute his valuations.

The restitution hearing was conducted over nine days between June 2020 and May 2021. During the proceedings, David obtained an order allowing inspection of a storage unit where Joanna allegedly stored items she took from Eagle Drive. Joanna filed a "motion in limine" reiterating her legal objections to the restitution proceeding and sought the recusal of the judge due to bias; her motions were denied.

After the trial, Joanna filed a motion for mistrial, which the court agreed to review before issuing a final decision. On July 27, 2021, the court entered its final decision (the restitution order); the notice of entry of order was filed August 11, 2021.

### 6. The Restitution Order

Initially, the restitution order reiterated the following findings from the restraining order: (1) despite the CSA provision giving David "exclusive use and possession of the property at Eagle Drive," Joanna had falsely represented in her ex parte application for exclusion order "that she had a right to be in the home and to take sole possession of the home"; (2) during David's exclusion, Joanna and her assistants had searched David's office, attic, computers, hard drives and financial documents; obtained a list of passwords to his devices; and forced open his safe and broke a lock on a

7

suitcase, accessing thousands of dollars in cash and gold coins, a firearm, and identification cards; (3) Joanna's testimony during the restraining order hearing was self-contradictory and not credible; and (4) Joanna was required to "return any property she confiscated when she improperly took possession of the home" by March 20, 2020.

The order then described evidence admitted during the nine-day restitution hearing, including David's accounting; his expert valuation report; Joanna's video/photo footage of the October 2019 civil standby, during which Joanna claimed David had surreptitiously taken a suitcase of gold; and photos of items found in Joanna's storage unit in April 2021. (The items depicted had, as of 2019, been stored in David's garage attic—along with other valuables that had gone missing and not been recovered.) The family court also took judicial notice of documents, such as the final order of divorce, MSA, CSA, and pleadings in this action.

The restitution order then summarized pertinent testimony, including David's as to how he found Eagle Drive upon regaining possession, the personal items that had gone missing, the purchase prices and replacement values for those items, and the items he found in Joanna's storage unit. It also described the testimony of David's expert on valuation and appreciation of the missing precious metals. And it discussed Joanna's testimony, including her admission that she took $11,530 in cash and her claim that she did not take any other items (including items found in her storage unit).

In its analysis, the court first noted its prior finding that Joanna confiscated and destroyed property in David's home and its prior determination that she must return it and framed the issue presented as "the amount of restitution owed." The court then made credibility findings, describing David's testimony as "detailed, corroborated, and credible," and

8

Joanna's (including that she took no gold and that David and his attorney had surreptitiously removed a suitcase of gold from Eagle Drive during the civil standby) as lacking credibility. It gave little weight to the testimony of her "investigator" Jerry Rivera, whom she had since married.

The family court found Joanna "has not returned any items, even the $11,530 in cash that she admitted to taking." It again rejected her claimed right to remove property from Eagle Drive and her assertion that the Virginia court's property-division orders precluded restitution. The court ordered Joanna to return specified items by August 26, 2021 and, for any item not returned, to pay an assigned monetary amount, with interest.[7] It further ordered Joanna to pay $6,017.74 for David's out-of-pocket expenses for car rental and hotel charges and $737.07 in replacement and repair costs for property damage, and to return his check ledgers, hard drives, laptops and financial records.

### 7. Further Proceedings

In addition to her mistrial motion, which was denied, Joanna unsuccessfully sought to vacate the restitution order, and asked for attorney fees and for other relief. She also challenged the trial judge for cause, pursuant to Code of Civil Procedure section 170.3. In May 2021, the challenge was stricken for failure to state any facts constituting a ground for disqualification. On October 12, 2021, Joanna filed another challenge, this time pursuant to Code of Civil Procedure section 170.1, which was also denied. Finally, Joanna filed a notice of appeal on October 21, 2021.

### DISCUSSION

Joanna assigns numerous errors to the family court, including that the restraining order did not include findings, required by section 6305,

---

[7] The value of these items, excluding interest, totaled $387,224.61.

subdivision (a)(2), to support mutual restraining orders; that the court exceeded its authority under section 6342 in awarding restitution for confiscated items; that the court's decisions were driven by bias (in violation of Joanna's right to due process) and a lack of "informed discretion"; and that the court intruded on the jurisdiction of the Virginia court presiding over the parties' dissolution case and failed to accord "full faith and credit" to its orders. She also asserts that certain findings are not supported by substantial evidence.

## I. Timeliness of Joanna's Appeal of the Restraining Order and Order Striking Challenge for Cause

First, we address David's contention that Joanna did not timely appeal the restraining order. He is correct. The Code of Civil Procedure makes "an order granting or dissolving an injunction, or refusing to grant or dissolve an injunction" appealable. (Code Civ. Proc., § 904.1, subd. (a)(6).) This includes an order granting or denying a request for DVRO. (*In re Marriage of Carlisle* (2021) 60 Cal.App.5th 244, 255; *S.M. v. E.P.* (2010) 184 Cal.App.4th 1249, 1257–1258; *Loeffler v. Medina* (2009) 174 Cal.App.4th 1495, 1502, fn. 9.)

The restraining order was entered and served on February 28, 2020. Joanna had six months to appeal the order. (Cal. Rules of Court, rule 8.104(a)(1)(C), (e).) She filed her notice of appeal on October 21, 2021. We therefore lack jurisdiction to consider her appeal from the restraining order. (Cal. Rules of Court, rule 8.104(a)(1)(C), (e); *Strathvale Holdings v. E.B.H.* (2005) 126 Cal.App.4th 1241, 1248.)

Joanna argues that the restraining order was not final for purposes of appeal until restitution was finally determined, as the order itself set a further hearing on restitution. However, the restraining order reserved only as to restitution and attorney fees. Nothing in the record or the order itself

10

suggests that the stayaway and custody orders contained therein were anything other than final.

Even an order granting a *preliminary* injunction is immediately appealable; the fact that final judgment remains to be entered does not extend the time to appeal. (*County of San Diego v. State of California* (1997) 15 Cal.4th 68, 110.) Nor does the issuance of later orders on related issues extend the time to appeal separately appealable, earlier orders. (See *In re Marriage of Padilla* (1995) 38 Cal.App.4th 1212, 1216 [sequential child support orders]; *In re Shaun R.* (2010) 188 Cal.App.4th 1129, 1139–1131 [sequential juvenile court orders]; *In re Cassandra B.* (2004) 125 Cal.App.4th 199, 208–209 [in dependency action, holding that appeal from initial restraining order was untimely, notwithstanding party's timely appeal from later, related restraining order].)

Joanna asserts that, for purpose of the timeliness of this appeal, treating the restraining order as separate from the restitution order would violate the single judgment rule, citing *San Joaquin County Dept. of Child Support Services v. Winn* (2008) 163 Cal.App.4th 296 (*Winn*). *Winn* concerned the appealability, prior to entry of final judgment, of an interim order for genetic testing in a parentage and support action. It held the genetic testing order was not a "final judgment" appealable under Code of Civil Procedure section 904.1, subdivision (a)(1), as it did not finally determine the rights of the parties in relation to the matter in controversy.[8] (163 Cal.App.4th at pp. 299–300.) By contrast, the restraining order resolved the core issue in this case—whether any party had committed "abuse" warranting the

---

[8] Further, in declining to treat the appeal as a writ, the court characterized the testing order as "interim" in nature, essentially a "discovery" order. (*Winn, supra,* 163 Cal.App.4th at p. 300.)

11

issuance of a restraining order. Moreover, *Winn* did not consider whether the genetic testing order was an "injunction," under section 904.1, subdivision (a)(6). (*Ibid.*) As an appealable injunction under that provision, the restraining order is not fairly analogized to an interim discovery order, appealable only upon entry of final judgment.

Joanna also attempts to collaterally attack the restraining order under *People v. American Contractors Indemnity Co.* (2004) 33 Cal.4th 653. She argues that collateral attack is permitted because the procedural posture in this case was "rather unusual" and the restitution hearing had been rescheduled due to the COVID-19 pandemic.

*American Contractors* involved a surety that failed to timely appear upon forfeiture of the bond. (*American Contractors v. American Contractors Indemnity, supra,* 33 Cal.4th at p. 659.) Summary judgment was entered, albeit prematurely, on the bond. (*Ibid.*) The surety did not timely appeal, and later moved to set aside the (then final) judgment. The trial court found it lacked jurisdiction to consider the motion. (*Id.* at p. 660.) The Supreme Court held that collateral attack on the voidable judgment was not permitted because the surety had not demonstrated it was prevented from timely filing a motion to set aside or notice of appeal. (*Id.* at pp. 663–665.) The court rejected the notion that uncertainty regarding the appealability of the summary judgment, or appellant's concerns regarding the potential jurisdictional impact of an appeal, constituted "unusual circumstances . . . that precluded earlier challenge of the judgment." (*Id.* at p. 665.) Joanna does not explain how a continuance of the restitution hearing or an unusual procedural posture impacted her ability to file a notice of appeal. Her grounds are indistinguishable from those that were rejected in *American Contractors*. Thus, we find no basis for collateral attack.

12

Joanna's challenges to the restraining order (including the arguments set forth in section III of her opening brief) are therefore untimely, and we lack jurisdiction to consider them.

David also objects to Joanna's appeal to the extent it is premised on the family court's purported bias, including the contention that it was error to strike Joanna's motion to disqualify the trial judge for judicial bias. David asserts that this aspect of Joanna's appeal is procedurally barred because she failed to timely challenge the order by writ of mandate. We agree. The exclusive avenue for review of orders regarding disqualification is by writ of mandate. (Code Civ. Proc., § 170.3, subd. (d); *PBA, LLC v. KPOD Ltd.* (2003) 112 Cal.App.4th 965, 970–971; *In re Marriage of Hubner* (2004) 124 Cal.App.4th 1082, 1088, fn. 10.) Thus, to the extent Joanna assigns error for the trial judge's alleged bias and failure to recuse, this is not a proper (or timely raised) subject of appeal.[9]

## II. The Scope of Restitutionary Relief Available under Section 6342, subdivision (a)(1)

Joanna contends that the family court exceeded its statutory authority, under section 6342, when it ordered restitution not just for David's lodging and auto expenses, but for "items purported [*sic*] removed or damaged by Joanna." Subdivision (a)(1) of section 6342 authorizes "[a]n order that restitution be paid to the petitioner for loss of earnings and out-of-pocket expenses, including, but not limited to, expenses for medical care and temporary housing, incurred as a direct result of the abuse inflicted by the

---

[9] Joanna also forfeited her claim that judicial bias deprived her of due process by failing to timely seek writ relief. (*People v. Brown* (1993) 6 Cal.4th 322, 336 [defendant in death penalty case who unsuccessfully sought writ review of motion to disqualify for cause could raise due process judicial bias claim on appeal; noting, however, that failure to seek writ review "may constitute a forfeiture of his constitutional claim"].)

respondent or any actual physical injuries sustained from the abuse." Subdivision (b) of section 6342 precludes any award of restitution for "damages for pain and suffering." The Family Code does not define "restitution," "lost earnings," or "out-of-pocket expenses."

Joanna's opening brief, beyond quoting the text of the statute, does not develop her argument. It does not cite to any authorities construing section 6342, identify the relevant rules of statutory construction, or discuss pertinent legislative history. For his part, David responds that section 6342 should be construed broadly to provide him with full financial compensation and recovery for any losses caused by Joanna's wrongful conduct, citing restitution cases decided under the unfair competition law (Bus. & Prof. Code, § 17200 et seq.) and Penal Code section 1202.4. We need not rely by analogy on other statutes, however, for it is well established that the DVPA should "be broadly construed in order to accomplish [its] purpose." (*In re Marriage of Nadkarni* (2009) 173 Cal.App.4th 1483, 1498.)

### A. *Applicable Rules of Statutory Interpretation*

We review issues of statutory interpretation de novo. (*J.H. v. G.H.* (2021) 63 Cal.App.5th 633, 641.) "[O]ur fundamental task is to ascertain the intent of the lawmakers so as to effectuate the purpose of the statute.' " (*Burquet v. Brumbaugh* (2014) 223 Cal.App.4th 1140, 1145.) We must " 'select the construction that comports most closely with the Legislature's apparent intent, with a view to promoting rather than defeating the statutes' general purpose.' " (*Poole v. Orange County Fire Authority* (2015) 61 Cal.4th 1378, 1385.) "[W]e start with the statute's words, assigning them their usual and ordinary meanings, and construing them in context. If the words themselves are not ambiguous, we presume the Legislature meant what it said, and the

14

statute's plain meaning governs." (*Wells v. One2One Learning Foundation* (2006) 39 Cal.4th 1164, 1190.)

" 'When attempting to ascertain the ordinary, usual meaning of a word [in a statute], courts appropriately refer to the dictionary definition of that word.' " (*Burquet v. Brumbaugh, supra*, 223 Cal.App.4th at p. 1146.) We also derive plain meaning in context, considering statutory structure and the text of related provisions. (See *Poole v. Orange County Fire Authority, supra*, 61 Cal.4th at pp. 1391–1393 (conc. opn. of Cuellar, J.) [statutory context may elucidate the meaning of otherwise "plain language" and inform as to existence of ambiguity in the first instance].)

Even where a statute is unambiguous, we " ' "may also look to a number of extrinsic aids, including the statute's legislative history, to assist us in our interpretation." ' " (*J.H. v. G.H., supra*, 63 Cal.App.5th at pp. 641–642.) We may consider the consequences of a particular interpretation, including its impact on public policy (*Wells v. One2One Learning Foundation, supra*, 39 Cal.4th at p. 1190) and we endeavor to avoid constructions that would lead to unreasonable, impractical or arbitrary results (*Poole v. Orange County Fire Authority, supra*, 61 Cal.4th at p. 1385).

### B. Restitution: General Principles

"Restitution" is " ' "an ambiguous term, sometimes referring to the disgorging of something which has been taken and at times referring to compensation for injury done." ' " (*People ex rel. Kennedy v. Beaumont Investment, Ltd.* (2003) 111 Cal.App.4th 102, 134.) It is commonly understood to mean " 'the act of making good, or of giving an equivalent for, loss.' " (*Walnut Creek Manor v. Fair Employment & Housing Com.* (1991) 54 Cal.3d 245, 263.) "Restitutive damages . . . are quantifiable amounts of money due an injured private party from another party to compensate for the pecuniary

loss directly resulting from the second party's violation of law." (*Ibid*.) By contrast, general compensatory damages (e.g., for emotional distress) "are not pecuniarily measurable, defy a fixed rule of quantification, and are awarded without proof of pecuniary loss." (*Ibid*.)

The restitution order is consistent with these principles. Having found that Joanna violated the DVPA by taking money and personal property from David's residence (§ 6203; § 6320, subd. (a) ["abuse" includes destruction of property]; § 6320, subd. (c) [abuse includes disturbing another party's peace through "coercive control" of "the other party's finances [or] economic resources"]) and determined that David's losses were "incurred as a direct result of the abuse" (§ 6342, subd. (a)(1)), the court gave Joanna the opportunity to "mak[e] good" the losses by returning the money and property taken. (*Walnut Creek Manor v. Fair Employment & Housing Com., supra,* 54 Cal.3d at p. 264). Only after Joanna failed to do so and the court conducted a hearing on valuation did restitution orders issue. Moreover, these orders were limited to documented, "pecuniarily measurable" losses. (*Id*. at p. 263.)[10]

### C. *Statutory Language*

Subdivision (a)(1) of section 6342 provides restitution for "loss of earnings and out-of-pocket expenses . . . incurred as a direct result of the abuse." An out-of-pocket expense is generally understood to be a loss or burden which one must pay out with one's own money, rather than with money from another source (such as an employer or insurance company). (See Merriam-Webster.com Dictionary <https://www.merriam-webster.com/ dictionary/out-of-pocket> [as of Mar. 29, 2023]; OED (Oxford English

---

[10] Significantly, Joanna did not offer any evidence controverting David's valuations.

Dictionary) Online ["out of funds; worse off financially"] <https://www.oed.com/view/Entry/146402?rskey=1YPaNu&result=3> [as of Mar. 29, 2023]; Merriam-Webster.com Dictionary ["a financial burden or outlay"] <https://www.merriam-webster.com/dictionary/expense> [as of Mar. 29, 2023]; see also Black's Law Dictionary (11th ed. 2019) pp. 723–724, col. 1 [defining "expense" as any "expenditure of money, time, labor, or resources to accomplish a result" and an "out-of-pocket expense" as "[a]n expense paid from one's own funds"].) An expense has been "incurred" if a party has become liable or subject to the expense. (See Merriam-Webster.com Dictionary, Merriam-Webster <https://www.merriam-webster.com/dictionary/incur> [as of Mar. 29, 2023]; see also Black's Law Dictionary (11th ed. 2019) p. 917, col. 1 [defining "incur" as "To suffer or bring on oneself (a liability or expense)"].) Thus, the ordinary, commonsense meaning of "out-of-pocket expenses . . . incurred" encompasses losses that a party has paid or will have to pay from his or her own funds.

Because the statute authorizes restitution "for loss of earnings and out-of-pocket expenses, including, but not limited to, expenses for medical care and temporary housing" (§ 6342, subd. (a)(1)), Joanna contends that we should read "out-of-pocket expenses" to exclude costs other than medical care or temporary housing. She invokes the statutory canon of *noscitur a sociis*, which provides that associated words in a list bear on one another's meaning. (*People v. Lucero* (2019) 41 Cal.App.5th 370, 398.) It does not apply here, as David has not asked us to construe one of the enumerated expenses (e.g., "medical care") to include the value of lost or damaged property. Rather, he

17

asks us to construe "out-of-pocket expenses" liberally, to include property damage and loss.[11]

Joanna also argues that the Legislature decided to permit restitution for various domestic-abuse-related costs, such as those incurred by a social service agency to provide abuse-related services (§ 6342, subd. (a)(3)), or those resulting from an improvidently granted TRO (§ 6342, subd. (a)(2)), but not "for compensatory damages." However, the canon she implicitly invokes, *expressio unius est exclusion alterius* (the inclusion of one thing implies the exclusion of others) is also unavailing, because subdivision (a)(1) of section 6432 permits restitution *"including, but not limited to"* expenses incurred for medical care and temporary housing. (Italics added; see also, e.g., *Estate of Banerjee* (1978) 21 Cal.3d 527, 540 [*expressio unius* inapplicable because "includ[es]" is "not ordinarily understood as expressing an intent to limit"]; *People v. Brooks* (2018) 23 Cal.App.5th 932, 943 [court should avoid constructions rendering statutory language mere surplusage].)

To the extent it applies, *expressio unius* arguably cuts the other way: The Legislature's express prohibition on "damages *for pain and suffering*" (§ 6342, subd. (b), italics added) implies that other types of damages are available. David does not seek relief for subjective, indeterminate general compensatory damages, such as pain and suffering, traditionally offered only in courts of law, but for objectively quantifiable harm flowing from a violation

---

[11] Joanna may have intended to invoke the canon of *ejusdem generis*, which restricts a " ' "general term or category . . . 'to those things that are similar to those which are enumerated specifically.' "' " (*People v. Lucero, supra,* 41 Cal.App.5th at p. 398.) Joanna has not explained, however, how restitution for the costs of replacing stolen property or money is a qualitatively different, more expansive remedy than restitution for expenses for "medical care" and "temporary housing." As discussed below, legislative history and policies underlying the DVPA suggest it is not.

of statutory law, more "akin to special damages." (*Walnut Creek Manor, supra,* 54 Cal.3d at p. 263.)

Neither party has proposed a coherent textual analysis or rationale for delimiting the scope of "out-of-pocket expenses incurred."[12] Read liberally, the text of subdivision (a)(1) of section 6432 appears to permit restitution for pecuniarily measurable expenses a litigant has been subjected to as a direct result of "abuse." To the extent there remains some ambiguity, however, we will also consider statutory context, legislative intent, and policies underlying the DVPA.

### D. Statutory Context and Legislative Intent

The DVPA itself states that its purpose "is to prevent acts of domestic violence, abuse, and sexual abuse and to provide for a separation of the persons involved in the domestic violence for a period sufficient to enable these persons to seek a resolution of the causes of the violence." (§ 6220; see also Stats. 1979, ch. 795, § 10, Sen. Judiciary Com. [purpose of DVPA's predecessor, Code of Civil Procedure section 579, "to provide the courts with effective tools with which to prevent domestic violence"].)

To this end, the DVPA sets forth a panoply of remedial orders. (See § 6320 et seq. [allowing the court to issue a wide variety of temporary orders, for example, property exclusion, stayaway, property control, custody, preservation of insurance coverage, etc.]; § 6340 et seq. [additional orders which may be issued after noticed hearing].) Many of these remedies are directed to prevent and mitigate financial coercion, e.g., orders for repayment

---

[12] There was no suggestion, for example, that "expenses incurred" should be limited to amounts actually paid to third parties (as opposed to amounts that may or will be paid out in future). While the issue is not before us, we note that such a construction would work an injustice on litigants who lack the financial ability to pay such losses before seeking restitution.

of debts incurred as a result of domestic violence (including as a result of identity theft) (§ 6342.5, subd. (b); Pen. Code, § 530.5); for payment of temporary child support (§ 6341); and precluding a party from cancelling, transferring, cashing out or otherwise impairing insurance coverage (§ 6325.5).

The Legislature has also expressed an intent to entrust the courts with some latitude in applying these remedies. (*In re Marriage of Nadkarni*, *supra*, 173 Cal.App.4th at p. 1498, quoting First Rep. of the Advisory Com. on Family Law to the Sen. Subcommittee on the Admin. of Justice, Domestic Violence (1978), p. 19 [" 'It is virtually impossible for a statute to anticipate every circumstance or need of the persons whom it may be intended to protect. Therefore, the courts must be entrusted with authority to issue necessary orders suited to individual circumstances, with adequate assurances that both sides of the dispute will have an opportunity to be heard before the court.' "];[13] see also § 6322 [permitting an "order enjoining a party

_____

[13] As to adequate process, Joanna objects that allowing restitution for lost and damaged property threatens to convert domestic violence proceedings into criminal proceedings, without any of the attendant constitutional safeguards ("a probable cause determination, an arraignment, a preliminary hearing, discovery, a jury [of] one's peers . . . and ultimately a determination by the jury that the offender acted with the requisite criminal intent in violating the Penal Code, beyond a reasonable doubt") which must be afforded before a person's property can be seized. The DVPA, however, already allows family courts to issue property control orders without these protections. (See § 6340, subd. (a)(1) [orders issuable "after notice and a hearing" include orders under section 6324 for property control]; see also § 6342.5, eff. Jan. 1, 2022 ["After notice and a hearing, the court may issue an order determining the use, possession, and control of real or personal property of the parties during the period the order is in effect."].) Thus, this argument does not support a narrow construction of subdivision (a)(1) to exclude property damage and loss.

20

from specified behavior that the court determines is necessary to effectuate orders under Section 6320 or 6321" to prevent "abuse"].)

With regard to restitution, specifically, legislative history is sparse. However, in an analysis of a 1982 amendment to add the remedy of restitution for the costs of services provided to victims of domestic abuse by social service agencies (a predecessor to section 6342, subd. (a)(3)), the Assembly Committee on Judiciary observed: "The bill would follow the intent of current law in requiring abusers to be financially responsible for their actions." (Stats. 1982, ch. 1238, § 1.) As to that same amendment, the Senate Republican Caucus analysis quoted the proponents' statement that restitution for the cost of agency services "would be an equitable way to meet the shelters' funding problems and would relieve the injured person from any obligation to pay." (*Ibid.*) This evinces an intent to shift financial burdens attributable to abuse to the abuser.

Construing "out-of-pocket expenses" to include property theft and damage losses resulting from "abuse" effectuates the legislative goals to empower courts to prevent abuse (particularly here, where the court found the property theft and damage itself constituted abuse) and shift financial responsibility for abuse to abusers. On the other hand, limiting "out-of-pocket expenses" to exclude such losses would impair enforcement of the DVPA and, as we discuss below, require victims to pursue relief in yet another legal action or forgo it altogether.

Finally, we observe that claims for lost or damaged property tend to be direct, tangible and readily quantifiable. They are not amorphous "general damages" that defy quantification. (*Walnut Creek Manor, supra*, 54 Cal.3d at pp. 263–264.) There is little risk that claims such as David's, which are both factually intertwined with and incidental to his abuse allegations, would mire

21

the family court in speculative, time-consuming, highly subjective valuation questions untethered from his domestic violence allegations. As such, resolving his restitution claim within the (also equitable) DVPA proceeding promoted, and did not undermine, the Legislature's clear mandate that domestic violence cases be heard and resolved expeditiously).[14]

## E. Relevant Policy Concerns

The Legislature has enacted numerous measures to increase access to justice in DVPA cases, including to reduce costs and delays and to ensure litigants' access to "self-help" resources. (See, e.g., § 6222 [no filing fees in DVPA actions]; § 244 [calendar priority over other matters]; § 6306.6, subd. (a) [requiring "[i]nformation about access to self-help services regarding [DVROs]" to be "prominently visible" on superior court websites]; Gov. Code, § 68092.1, subd. (b) & Evid. Code, § 756 [granting DVPA proceedings highest priority among civil case types for court interpreter services].) Thus, we strive to construe the DVPA consistent with our state's policy of ensuring "fair and accessible justice" in family law proceedings. (*Elkins v. Superior Court* (2007) 41 Cal.4th 1337, 1366 [invalidating local rules of procedure for interfering

---

[14] (See, e.g., §§ 244 [requiring trial to be set for earliest possible day and giving applications for restraining orders calendar preference over other matters]; 6326 [requiring court to rule on TRO applications, if possible, on same day they are filed]; 6320.5 [where jurisdictionally adequate application for TRO is denied, entitling petitioner to hearing within 21–25 days].)

We are not concerned that permitting restitution for lost or destroyed property risks converting an equitable, streamlined injunctive proceeding into a civil tort claim. Section 6342 already permits the recovery of restitutive damages for lost earnings, and for medical care and housing expenses. (See also *Walnut Creek Manor, supra,* 54 Cal.3d at p. 264 [discussing unfair competition law's distinction between restitutive, special damages, allowed in streamlined equitable procedure, and general compensatory damages, which are not].) David's losses are equally amenable to objective valuation.

with statutory right to present evidence at hearings]; *S.A. v. Maiden* (2014) 229 Cal.App.4th 27, 37 [DVPA action is family law proceeding].)

Although David and Joanna are represented by counsel, this policy assumes greater importance in domestic violence litigation, not only due to the need to reduce delay, but because a large percentage of DVPA actions involve self-represented litigants. (*In re Marriage of D.S. & A.S. (D.S.)* (2023) 87 Cal.App.5th 926, 934, citing *Ross v. Figueroa (Ross)* (2006) 139 Cal.App.4th 856, 861 & fn. 3 [estimating that 90 percent of litigants in DVRO cases appear pro se].)

Joanna's narrow reading of section 6342, subdivision (a)(1) would undermine the Legislature's efforts to ensure that DVPA actions be resolved in proceedings that are, to the extent possible, streamlined, accessible and expeditious. Were we to adopt her interpretation, victims would be required to forgo relief for abuse-related property loss or seek relief outside of the family court, either by relying upon the district attorney to pursue criminal charges, or by filing a new, civil tort action for harm that was directly caused by abuse. This would transform a relatively straightforward court hearing, before a bench officer familiar with the parties and underlying facts, into a duplicative and more burdensome endeavor.[15] Self-represented litigants would face the daunting prospect of navigating yet another court proceeding, without the same self-help resources available in a DVPA action. And those fortunate enough to afford representation would be required to incur

---

[15] A restrictive construction could also lead to absurd results or arbitrary distinctions. For example, when an abuser is willing to comply with an order to return property taken in the course of the abuse (§§ 6324, 6340) a victim could be restored to his or her status quo ante, but if that same abuser does not comply with the order, or destroys or disposes of the subject property, the same loss would not be compensable in the DVPA proceeding.

additional costs in yet another proceeding, contrary to the Legislature's stated goal to reduce the expense of family law litigation. (See *S.A. v. Maiden, supra,* 229 Cal.App.4th at p. 38 [considering this policy in disallowing malicious prosecution actions against persons seeking DVROs].) A narrow construction of section 6342 would therefore discourage victims of domestic violence from pursuing relief to which they are otherwise entitled. (*Ibid.* [disincentive to apply for protective relief is a "chilling effect," contrary to public policy underlying DVPA].)

We therefore conclude that statutory context, legislative intent, and the policy favoring access to justice in DVPA actions support our conclusion that section 6342 permits restitution for the value of property lost or damaged as a direct result of "abuse."

## III. Subject Matter and Concurrent Jurisdiction

Joanna next objects the family court lacked "subject matter jurisdiction" to "characterize" the Eagle Drive property and personal property at issue as "David's property" because the Virginia court, then presiding over the parties' dissolution, had exclusive jurisdiction over the parties' property.

Initially, we observe that the Virginia court's jurisdiction to enforce the MSA did not deprive the California family court of subject matter jurisdiction over the parties' dueling DVPA petitions. (See § 200 [subject matter jurisdiction]; § 6221 [request for restraining order may be filed under DVPA, or in connection with other family law actions]; § 6345 [acknowledging court authority under DVPA to make orders regarding "disposition of property"]; § 6325 [allowing court to issue certain ex parte orders restraining married persons "from specified acts in relation to" community and separate property]; § 6227 ["remedies provided in this division are in addition to any other civil or criminal remedies that may be available to the petitioner"]; see

24

also *Zaragoza v. Superior Court* (1996) 49 Cal.App.4th 720, 725 [first-in-time out-of-state dissolution judgment may impair California court's in rem jurisdiction (over marital status and the estate) but not its "subject matter" jurisdiction].)

Joanna's argument also fails for the simple reason that it mischaracterizes the orders and proceedings below. The court expressly declined Joanna's invitation to determine property ownership interests and directed Joanna to "make her claims" regarding ownership in the Virginia courts. It took care to address only possessory rights, finding that Joanna had no right to remove or destroy "property over which [David] had been granted sole possession" and ordering her to return it (or, later, its equivalent) to David's possession. The court also declined to modify or enforce the MSA or to characterize or divide property, taking pains to leave such determinations to the Virginia court. Thus, there was no conflict between courts with concurrent jurisdiction. (See, e.g., *County of Siskiyou v. Superior Court* (2013) 217 Cal.App.4th 83, 91 [for rule of exclusive concurrent jurisdiction to apply, "the issues in the two proceedings must be substantially the same and the individual suits must have the potential to result in conflicting judgments"].)[16]

---

[16] As the issue was not briefed or argued, we do not make it a basis for our decision; but we note that in her own application for restraining order, Joanna sought possession of Eagle Drive and all personal property on the premises. Having acceded to the court's authority to issue the very type of order to which she now objects, in the same proceeding, she would be estopped to deny concurrent jurisdiction. (See *Sea World Corp. v. Superior Court* (1973) 34 Cal.App.3d 494, 501 [unlike subject matter jurisdiction, the issue of precedential jurisdiction may be waived, including by party's affirmative invocation of court's jurisdiction].)

25

**IV. Constitutional Challenges to Restitution Order**

Joanna also raises constitutional objections. First, she asserts the family court failed to accord full faith and credit to the MSA (as adopted by the Virginia court), specifically, its general release. Joanna contends the MSA released all claims the parties may have had against each other, without limitation. The release, however, is limited to claims concerning property distribution "up to the date of the execution of this agreement." It therefore only released claims that had accrued by August 10, 2019. David's restitution claims did not accrue until at least six weeks later. Moreover, Joanna does not address David's contention that the laws of California (Code Civ. Proc., § 1542), and possibly Virginia, impose limitations on such releases.

Joanna's argument that the family court improperly characterized and divided marital property, and thereby failed to accord "full faith and credit" to the Virginia court's property-division orders (and her related assertion that her ownership interest in Eagle Drive was somehow compromised) fails for the same reason her jurisdictional arguments in section III fail: the court did not purport to characterize or divide property.

Joanna also claims she was deprived of due process by David's failure to plead a claim for restitution in his original request for DVRO (the DV-100) and by his failure to specifically identify allegedly lost or destroyed property. David responds that Joanna failed to raise this objection below, resulting in forfeiture. Joanna disagrees, but not one of her many record cites disclose any objection relating to inadequate notice. (*Boyle v. CertainTeed Corp.* (2006) 137 Cal.App.4th 645, 650; *Doers v. Golden Gate Bridge etc. Dist.* (1979) 23 Cal.3d 180, 184, fn. 1 ["appellate court will ordinarily not consider procedural defects or erroneous rulings . . . where an objection could have been but was not presented to the lower court"].)

26

Even if she did not forfeit this argument, Joanna cites no legal authority that an applicant's failure to "check the box" for restitution orders forfeits the right to restitution. Section 6342 only requires "notice and a hearing," both of which Joanna received. (§ 6342, subd. (a)(1); *In re William M.W.* (2019) 43 Cal.App.5th 573, 583 [" ' " 'If the plain, commonsense meaning of a statute's words is unambiguous, the plain meaning controls.' " ' "]; see also *Faton v. Ahmedo* (2015) 236 Cal.App.4th 1160, 1170 [entitlement to attorney fees not waived by failure to plead, provided opposing party was given notice and a hearing].)

Nor has Joanna identified any prejudice she suffered. (*In re Angela C.* (2002) 99 Cal.App.4th 389, 394.) She received ample notice of the hearing and time to respond to David's detailed accounting. The record reflects no disadvantage due to David's initial failure to plead, with specificity, a restitution claim.

Finally, under the circumstances of this case, it would be highly inequitable to require the degree of specificity advocated by Joanna. When David filed his request for restraining order and for three months following, a TRO prevented him from accessing Eagle Drive, and therefore from assessing the nature and extent of his losses or obtaining relevant documentation. He nonetheless requested property control orders, described Joanna's attempts to gain access to his personal property and information, and voiced concerns regarding loss and damage. We do not see how his application could have been more specific. In any event, David's application was consistent with generally accepted standards for pleading in DVPA actions (*In re Marriage of Davila & Mejia* (2018) 29 Cal.App.5th 220, 227) and adequate to put Joanna on notice of the general nature and basis of a future restitution claim.

## V. Challenges to Sufficiency of Evidence

Joanna also objects to the family court's factual findings, primarily, that she removed from Eagle Drive $200,000 of gold that was previously stored in a carry-on suitcase. She contends there was no evidence that she removed this gold, and that direct evidence established that David and his attorney took it from the marital home in a carefully orchestrated "switcheroo" during the October 22, 2019 civil standby.

"The inquiry is whether substantial evidence supports the court's finding, not whether a contrary finding might have been made." (*M.S. v. A.S.* (2022) 76 Cal.App.5th 1139, 1144.) Thus, we accept as true evidence tending to establish the correctness of the trial court's findings and resolve conflicts in favor of the judgment. (*Ibid.*) "If more than one rational inference can be deduced from the facts, we may not replace the trial court's conclusions with our own." (*Sieg v. Fogt* (2020) 55 Cal.App.5th 77, 89.) So long as there is substantial evidence—that is, evidence of ponderable legal significance, reasonable in nature, credible, and of solid value—we must uphold the trial court's factual findings. (*Ibid.*)

Having "watched and considered the video introduced as Wife's Exhibit A and Exhibit B numerous times," the family court concluded, "[t]he video corroborates the testimony of [David and his attorney] regarding the events that occurred during the civil standby." It found Joanna's testimony on this issue not credible. The court concluded that "counsel picked up the wrong suitcase by accident and that the suitcase . . . did not contain any gold." We decline the invitation to reweigh the evidence and resolve evidentiary conflicts; and we conclude that, considering the record as a whole, substantial evidence supports the court's finding that Joanna, not David, took this gold from Eagle Drive.

In a footnote, Joanna challenges the award of out-of-pocket expenses for costs David incurred due to his three-month exclusion from Eagle Drive. She argues that the family court erroneously concluded that David's rental car and hotel expenses resulted from her "abuse" (rather than from his arrest for abusing her). The court did not award these amounts as out-of-pocket expenses resulting from abuse, but as expenses incurred "as a result of an ex parte order that is found by the court to have been issued on facts shown at the hearing to be insufficient to support the order." (§ 6342, subd. (a)(2).)

Moreover, the relevant evidence was undisputed. In her TRO application, Joanna claimed under penalty of perjury a legal right to possess the Eagle Drive home, described it as a "family residence" in which she held an interest, and failed to divulge the court-approved agreement granting David exclusive use and possession of the home. Even if she held an ownership interest in the home, she plainly lacked "a right under color of law to *possession* of the premises." (§ 6321, subd. (b)(1), italics added.) It was no error to conclude she had "improperly obtained sole possession of the property by making untruthful statements to the court in her application for a [TRO]." And as to the amount of "expenses [David] incurred while he was removed from the house," the court found David's evidence—which was not genuinely controverted by Joanna—to be "credible." Thus, the family court did not err in awarding David restitution for hotel and auto rental expenses during the period he was wrongfully excluded from Eagle Drive.

## DISPOSITION

The restraining order and restitution order are affirmed. David is entitled to costs on appeal. (Cal. Rules of Court, rule 8.278(a)(2).)

WHITMAN, J.*

WE CONCUR:

STREETER, Acting P. J.
GOLDMAN, J.

---

* Judge of the Superior Court of California, County of Alameda, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

| | |
|---|---|
| Trial court: | Marin County Superior Court |
| Trial judge: | Honorable Sheila Shah Lichtblau |
| Counsel for plaintiff and appellant: | FAMILY LEGAL, A Professional Law Corporation, Edward M. Lyman |
| Counsel for defendant and respondent: | Ann F. VanDePol, Esq. |

A163818